# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **Harlow N. Higinbotham**, | Bankruptcy No. 18-31185 |
| Debtor. | Honorable LaShonda A. Hunt |

## NOTICE OF MOTION
## AND OBJECTION TO DEBTOR'S EXEMPTIONS

**Please take notice** that, on **February 21, 2019, at 10:00 a.m.**, or as soon thereafter as counsel may be heard, the undersigned shall appear before the Honorable LaShonda A. Hunt, United States Bankruptcy Judge for the Northern District of Illinois, in Courtroom 719 of the United States Courthouse, at 219 South Dearborn Street, Chicago, Illinois, to present the **Amended Motion of Wipaporn Teekhungam and the Parties' Minor Children to (a) Set Hearing on Objection to Exemptions, (b) Set Briefing Schedule**, and **(c) Set Discovery Schedule, and Amended Objection to the Debtor's Objections**, a copy of which is included herewith and served upon you, at which time and place you may appear.

Dated: February 11, 2019

**Wipaporn Teekhungam, A.H**, a minor, **A.H.**, a minor, and **A.H.**, a minor

By: /s/ William J. Factor
One of Their Attorneys

William J. Factor (6205675)
Deborah K. Ebner, Of Counsel (6181615)
Jeffrey K. Paulsen (6300528)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel:    (847) 239-7248
Fax:    (847) 574-8233
Email: wfactor@wfactorlaw.com
        dkebner@deborahebnerlaw.com
        jpaulsen@wfactorlaw.com

{00133072}

## CERTIFICATE OF SERVICE

I, William J. Factor, an attorney, hereby certify that on February 11, 2019, pursuant to Section II.B.4 of the Administrative Procedures for the Case Management/Electronic Case Filing System and Fed.R.Civ.P. 5(a), I caused a copy of the foregoing *Notice of Motion* and the accompanying *Motion* to be served electronically through the Court's Electronic Notice for Registrants on all persons identified as Registrants on the Service List below and by U.S. mail on all other persons identified on the Service List.

/s/ William J. Factor

## SERVICE LIST

**Registrants**
(Service via ECF)

| | |
|---|---|
| Bianca E. Ciarroni | bciarroni@freeborn.com, bkdocketing@freeborn.com |
| Michael K. Desmond | mdesmond@fslegal.com, dorisbay@fslegal.com |
| Deborah K. Ebner | dkebner@deborahebnerlaw.com, webmaster@debnertrustee.com, lizd@deborahebnerlaw.com |
| William J. Factor | wfactor@wfactorlaw.com, wfactorlaw@gmail.com, bharlow@wfactorlaw.com, wfactor@ecf.inforuptcy.com, wfactormyecfmail@gmail.com, factorwr43923@notify.bestcase.com |
| Shira R. Isenberg | sisenberg@freeborn.com, bkdocketing@freeborn.com. jhazdra@ecf.inforuptcy.com |
| Patrick S. Layng | USTPRegion11.ES.ECF@usdoj.gov |
| Jeffrey K. Paulsen | jpaulsen@wfactorlaw.com, bharlow@wfactorlaw.com, jpaulsen@ecf.inforuptcy.com |
| Nathan Q. Rugg | Nathan.Rugg@bfkn.com, jean.montgomery@bfkn.com |
| Gregory K. Stern | greg@gregstern.com, steve_horvath@ilnb.uscourts.gov |

**Non-Registrants**
(Service via U.S. Mail)

Harlow N. Higinbotham
RD No. 2
2002 East Cass St.
Joliet, IL 60432

American Express
PO Box 981537
El Paso, TX 79998

Harlow N. Higinbotham
1500 N. Lake Shore Dr.
Unit 13-C
Chicago, IL 60610

Casale Reporting Service Inc.
33 N. Dearborn St.
Suite 1506
Chicago, IL 60602

Beerman LLP
161 N. Clark St.
Suite 3000
Chicago, IL 60601

Chase Card
PO Box 15298
Wilmington, DE 19850

Citicards
PO Box 6241
Sioux Falls, SD 57117

Discover Financial Services LLC
PO Box 15316
Wilmington, DE 19850

E.D. Higinbotham Trust
1500 N. Lake Shore Dr.
Unit 13-C
Chicago, IL 60610

Fox Rothschild LLP
321 N. Clark St.
Suite 800
Chicago, IL 60654

H.N. Higinbotham Trust
1500 N. Lake Shore Dr.
Unit 13-C
Chicago, IL 60610

McDermott Will & Emery
444 W. Lake St.
Suite 4000
Chicago, IL 60606

Susan S. Higinbotham
RD No. 2
2002 E. Cass St.
Joliet, IL 60432

Tileke & Gibbins
1011 Rama 3 Road
Chongnonsi, Yannawa
Bangkok, Thailand 10120

Wentzel Law Offices
77 W. Washington St.
Suite 2100
Chicago, IL 60602

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **Harlow N. Higinbotham**, | Bankruptcy No. 18-31185 |
| Debtor. | Honorable LaShonda A. Hunt |

## AMENDED MOTION OF WIPAPORN TEEKHUNGAM AND THE PARTIES' MINOR CHILDREN TO (A) SET HEARING ON OBJECTION TO EXEMPTIONS, (B) SET BRIEFING SCHEDULE, AND (C) SET DISCOVERY SCHEDULES, AND AMENDED OBJECTION TO THE DEBTOR'S EXEMPTIONS

Through this amended objection and motion, Wipaporn Teekhungam and the parties' eleven-year-old triplets, A.H., A.H., and A.H. ("***Movants***"), ask the Court to enter an Order disallowing the Debtor's exemption of certain property: the Joliet Property, and the Northern Trust Margin Account (the "***Non-Exempt Property***"). The Movants also ask the Court to disallow the Debtor's exemption of life insurance policies, an annuity, an IRA, a supplemental savings and investment plan,  and a 401(k) account (the "***Additional Information Property***") pending additional information that will enable the Movants to examine whether the Additional Information Property truly is exempt under applicable law.[1]  Movants also request

---

[1] Section 522(l) of the Bankruptcy Code provides:

> The debtor shall file a list of property that the debtor claims is exempt under Subsection (b) of this Section.  If the debtor does not file such a list, a dependent of the debtor may file such a list, or may claim property of the estate on behalf of the debtor.  Unless a party in interest objects, the property claimed as exempt on such list is exempt.

a hearing on any issue the Debtor raises in opposition to this Objection to the Debtor's exemptions and that the Court set a briefing and discovery schedule.[2]

## 1. JURISDICTION.

This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois. Venue of the above-captioned case (the "*Case*") and of this motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(1) and (b)(2)(A).

## 2. BACKGROUND.

The Movants filed a motion for stay relief and a motion to dismiss the Case, each of which explained the Debtor's efforts to render himself judgment proof against the claims of the Movants.  At least one court already has adjudged this to be the Debtor's obsession over the last decade.  After a lengthy trial, Judge Jeanne Cleveland Bernstein of the Cook County Circuit Court (the "*State Court*") found the Debtor engaged in "an 'illusory' course of conduct designed to remove all of his assets from himself and transfer them to his wife, Susan" as part of "an effort to reduce his ability to pay child support." The scheme between the Debtor and his wife also is evident in their joint efforts to claim as exempt certain property that does not merit that designation, as explained below.

### 2.1. The Debtor and his spouse engaged in a long-running scheme to make him judgment proof.

Although the scheme hatched by the Debtor and his wife is long and detailed, much of it has already been presented to the Court through the Movant's motions

---

[2] Bankruptcy Rule 4002(c) provides that "In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections."

for stay relief and to dismiss, which are incorporated herein by this reference thereto. For present purposes, it suffices to note that this Case arises out of a long-running, multi-continental dispute over the failure of Harlow N. Higinbotham (the "Debtor") to pay child support to the Movants. The Debtor and Teekhungam met in Thailand in 2001, while the Debtor was married to Susan Higinbotham. The Debtor and Teekhungam continued their relationship, eventually undergoing IVF treatment and having their triplet sons on November 5, 2008. The Debtor provided financial support for Teekhungam and the children during this period.

The Debtor attempted to keep Teekhungam and the children a secret from his wife, but on or about September 6, 2009, she learned about them. Immediately after the Debtor's wife's discovery of the children, the Debtor and his wife then concocted a decade-long scheme to deprive the Movants of the financial support to which they were entitled. Among other things, the Debtor transferred a house in Joliet (estimated to be worth almost $4 million) that he owned solely in his name into tenancy by the entirety via a quit claim deed recorded September 28, 2009, just weeks after his wife learned of the Movants' existence. He now claims that house is exempt from creditors. He also gifted half his shares in a multi-million-dollar Chicago cooperative to her in February 2011. And he executed fake promissory notes in her favor,[3] purported to transfer millions of dollars to her and to give her all of his property.

For example, the Debtor and his wife signed a handwritten document dated September 16, 2011, which purported to gift all of the Debtor's property to his wife: "I hereby grant to Susan S. Higinbotham, my wife, all of my worldly possessions, in consideration of her countless hours of devotion to me and our family and her

---

[3] In a "promissory note" dated September 27, 2009, the Debtor promised to pay his wife $4 million, at 15% interest, on demand, collateralized by "all of my art, stamps, coins, jewelry, and other tangible assets owned by me as well as 10,000 shares of ITW and future bonus income."

commitment to our marriage now and forever." In another example, although his wife is not an attorney, the Debtor signed a handwritten document dated April 8, 2013, in which he issued her a promissory note for $10 million to "acknowledge the services that you have been rendering to me on various legal matters of great import to my reputation and future." The $10 million bore no relationship to anything relevant and instead was just "a number [Ms. Higinbotham] suggested and [the Debtor] agreed with." Tr. of § 341 Meeting at 24:21–24, a copy of which is attached as Exhibit A. No money changed hands. *Id.* at 24:25–25:4. Based upon the foregoing, the Debtor purported to transfer more than $2.7 million in cash to his wife over the past nine years. Of that, he transferred about $2.2 million after supposedly transferring "all his worldly possessions" to her in September 2011.

The Debtor continued his charade in the State Court proceeding in which Judge Bernstein was trying to establish the Debtor's child support obligations. There, he submitted a financial affidavit that was supposed to fully disclose all his assets, but instead listed only 10% of many assets' values. He diluted the values in this way because, he claimed, his wife "owned" the other 90% of those assets. To compound this misrepresentation, the Debtor also listed debts supposedly owed to his wife, effectively double counting these illusory obligations. That affidavit is the subject of pending sanctions motions in the State Court.

## 2.2.  The State Court entered a judgment against the Debtor and the Debtor filed for bankruptcy to forestall enforcement of that judgment.

In June and August 2018, after years of litigation, Judge Bernstein held a trial on modification of the child support obligation the Debtor owed the Movants. On September 14, 2018, Judge Bernstein entered a judgment in favor of the Movants and against the Debtor.  Among other things, Judge Bernstein made extensive findings about the Debtor's misconduct over the years, and ordered him to pay $11,000 in support each month for each of the children and to fund a $1.5 million trust for each of the children.  On November 5, 2018, Judge Bernstein fixed the

amount of the past-due child support at $1,979,972.09, entered a money judgment against the Debtor, and provided a mechanism for enforcement of the judgment through the previously appointed receiver.

The Debtor filed this Case hours after entry of the November 5 order, with a stated purpose of staying that order. Four days later, the Movants filed a motion for stay relief (ECF No. 10), seeking to terminate the stay with respect to the State Court proceeding. That motion was granted in part.[4]

### 2.3. The Debtor's exemptions are unsustainable.

On November 19, 2018, the Debtor filed his Schedules, including Schedule C. Schedule C was amended on December 10, 2018 and on January 10, 2019.[5]  A true and correct copy of the amended Schedule C is attached hereto and incorporated herein as Exhibit B.

The version of Schedule C the Debtor filed on January 10, 2019, endeavors to exempt the property listed in the below chart, which reports the designated value of the property, the amount of the exemption, the applicable statutory basis for the exemption, and the basis for the Movants' objection:

| Description of Property | Amount of Exemption | Statutory Basis for Exemption | Value of Property | Basis for Objection |
|---|---|---|---|---|
| 2002 E. Cass Rd Joliet, Illinois | $15,000.00 | 735 ILCS 5/12-901 | **$1,987,350.00** | Not homestead |
| 2002 E. Cass Rd Joliet, Illinois | 100% | 735 ILCS 5/12-112 | **$1,987,350.00** | Property transferred with intent to defraud; not homestead |
| 2002 Chevy Silverado | $2,400.00 | 735 ILCS 5/12- 1001(c) | $4,000.00 | |

---

[4] In the latest maneuver, on December 28, 2018, the Debtor's wife filed her own divorce petition. Discovery has been served upon the Debtor's wife to ascertain, among other things, the bona fides of this filing or whether it is another chapter in the collusive attempt to thwart the Movants' rights.

[5] On January 3, 2019, the Court entered an order extending the deadline for the Movants to object to the Debtor's exemptions to February 14, 2019.

| Description of Property | Amount of Exemption | Statutory Basis for Exemption | Value of Property | Basis for Objection |
|---|---|---|---|---|
| Necessary Wearing apparel | $5,000.00 | 735 ILCS 5/12-1001(a) | $5,000.00 | |
| Checking account ending in 1987 | $4,000.00 | 735 ILCS 5/12-1001(b) | $36,510.00 | |
| Brokerage Account ending in 6357 | 100% | NJ Rev. Stat. 46:3-17.2 | $10,691,837.41 | NJ law does not apply and not exempt under Illinois law; property transferred with intent to defraud |
| 401(k) Marsh & McLennan | 100% | 735 ILCS 5/12–1006 | $816,825.17 | Additional information needed for evaluation |
| Supplemental Savings & Investment Plan | 100% | 735 ILCS 5/12–1006 | $713,008.52 | Not listed on amended Schedule C and additional information needed for evaluation. |
| Rollover Fidelity IRA | $1,807,236.63 | 735 ILCS 5/12-1006 | $1,811,231.85 | Additional information needed for evaluation |
| Roth Retirement Account | $37,699.08 | 735 ILCS 5/12-1006 | $37,699.08 | Additional information needed for evaluation |
| Retirement Annuity Through Employer | 100% | 735 ILCS 5/12-1006 | unknown | Additional information needed for evaluation |
| AXA Life Insurance 329 | 100% | 735 ILCS 5/12-1001(h)(3) | $ 7,980.00 | Additional information needed for evaluation |
| AXA Life Insurance 329 | 100% | 735 ILCS 5/12-1001(f) | $7,980.00 | Additional information needed for evaluation |
| AXA Life Insurance 664 | 100% | 735 ILCS 5/12-1001(h)(3) | $6,790.00 | Additional information needed for evaluation |

| Description of Property | Amount of Exemption | Statutory Basis for Exemption | Value of Property | Basis for Objection |
|---|---|---|---|---|
| AXA Life Insurance 664 | 100% | 735 ILCS 5/12-1001(f) | $6,790.00 | Additional information needed for evaluation |
| AXA Life Insurance 136 | 100% | 735 ILCS 5/12-1001(h)(3) | $6,500.00 | Additional information needed for evaluation |
| AXA Life Insurance 136 | 100% | 735 ILCS 5/12-1001(f) | $6,500.00 | Additional information needed for evaluation |
| AXA Life Insurance 992 | 100% | 735 ILCS 5/12-1001(h)(3) | $6,592.00 | Additional information needed for evaluation |
| AXA Life Insurance 992 | 100% | 735 ILCS 5/12-1001(f) | $6,592.00 | Additional information needed for evaluation |
| AXA Life Insurance 821 | 100% | 735 ILCS 5/12-1001(h)(3) | $6,425.00 | Additional information needed for evaluation |
| AXA Life Insurance 821 | 100% | 735 ILCS 5/12-1001(f) | $6,425.00 | Additional information needed for evaluation |
| AXA Life Insurance 923 | 100% | 735 ILCS 5/12-1001(h)(3) | $8,657.84 | Additional information needed for evaluation |
| AXA Life Insurance 923 | 100% | 735 ILCS 5/12-1001(f) | $8,657.84 | Additional information needed for evaluation |
| Farm tools | $2,500.00 | 735 ILCS 5/12-1001(d) | $1,500.00 | |

## 3. DISCUSSION

An individual debtor may exempt certain property from property of the estate. 11 U.S.C. § 522. "Since Illinois has opted out of the federal exemption scheme in 11 U.S.C. § 522, the exemptions available to Illinois debtors are found in Illinois statutes such as 735 ILCS 5/12-1001." *In re Currey*, No. 17 B 10647, 2018 Bankr. LEXIS 443, at *2 (Bankr. N.D. Ill. Feb. 16, 2018).

Here, the Debtor is not entitled to several of his claimed exemptions, so they should be disallowed.

## 3.1.  The Northern Trust margin account is not an exempt asset.

The Debtor's Schedule C erroneously asserts his interest in the "Brokerage Account ending in 6357" at the Northern Trust (the "***Northern Trust Margin Account***") is an exempt asset. The Debtor asserts this account is 100% exempt, so that the $10,691,837.41 listed in Schedule C (net value of approximately $5 million) is not property of his bankruptcy estate, based upon a New Jersey statute. That statute permits certain personal property to be held in tenancy by the entirety, and thus not subject to the claims of individual creditors. Presumably, the Debtor is asserting the Northern Trust Margin Account is owned by a tenancy by the entirety consisting of his interest and his wife's interest.

The Debtor's assertion that New Jersey tenancy by the entirety law applies to determine the exemption for the Northern Trust Margin Account is misguided. Under any of the applicable tests, Illinois law applies, and it does not permit a bank account (or any personal property) to be owned in tenancy by the entirety.

Illinois law applies, first, because the Debtor and his wife are domiciled here.[6] In *In re Giffune*, 343 B.R. 883 (Bankr. N.D. Ill. 2006), the Debtor was an Illinois resident and claimed an exemption in a Michigan house and an Illinois house.  The Michigan exemption was based upon Michigan law.  Judge Squires concluded that the Michigan exemption was not well founded because Illinois law applied and did not permit such a result. The *Giffune* court reasoned that:

---

[6] "In accordance with the provision of Section 522(b) of the Bankruptcy Code of 1978, (11 U.S.C. 522(b)), residents of this State shall be prohibited from using the federal exemptions provided in Section 522(d) of the Bankruptcy Code of 1978 (11 U.S.C. 522(d)), except as may otherwise be permitted under the laws of Illinois." 735 Ill. Comp. Stat. 5/12-1201.

> Illinois is undisputedly the Debtor's state of domicile
> under § 522(b)(2)(A). Thus, the Court must consider and
> apply the Illinois exemption statute which limits a
> debtor's exemptions to those "permitted under the laws of
> Illinois." 735 ILL. COMP. STAT. 5/12-1201. The plain
> meaning of the statute allows the Debtor to utilize only
> those exemptions provided by Illinois law. The cases on
> this point appear uniform. *See In re Rosenzweig*, 245 B.R.
> 836, 839 (Bankr. N.D. Ill. 2000); *Fishman*, 241 B.R. at
> 572; *In re Franklin*, 210 B.R. 560, 563-64 (Bankr. N.D. Ill.
> 1997); *In re Ball*, 201 B.R. 204, 206 n.4 (Bankr. N.D. Ill.
> 1996); *In re McClure*, 175 B.R. 21, 22 (Bankr. N.D. Ill.
> 1994); *In re Templeton*, 146 B.R. 757, 759 (Bankr. N.D. Ill.
> 1992); *In re Peacock*, 119 B.R. 605, 607 (Bankr. N.D. Ill.
> 1990), *aff'd*, 125 B.R. 526 (N.D. Ill. 1991). Equally
> significant, Illinois law limits the creation of tenancy by
> the entirety to homestead property. 765 ILL. COMP.
> STAT. 1005/1c.

*Id.* at 896

Some courts focus on the situs of the property claimed as exempt. *Holland v. Safanda (In re Holland)*, 366 B.R. 825, 828 (N.D. Ill. 2007). Here, The Northern Trust is headquartered in Illinois (and does not appear to have *any* branches in New Jersey) and the address for Northern Trust on the account statements is 50 S. LaSalle St., Chicago, so Illinois is the situs of the Northern Trust Margin Account. Thus, even if the situs of the account is relevant to the analysis, Illinois law still applies.

Other courts apply the law of the state with the most significant relationship. *Id.* Illinois has the most significant relationship to the Northern Trust Margin Account because The Northern Trust, the Debtor, and his wife are located here, and the subject Case is pending here, as is the child support litigation. Based upon available information, New Jersey does not have any nexus to the Northern Trust Margin Account. Thus, Illinois law applies under the most-significant-relationship test.

Finally, even if, *arguendo,* New Jersey law applied, the Northern Trust Margin Account is not an exempt asset, for at least 3 independent reasons.  First, the tenancy is created when "[a] husband and wife together take title to an interest in real property or personal property under a written instrument designating both of their names as husband and wife." N.J. Stat. § 46:3-17.2.  In this case, the Northern Trust Margin Account statements from June of 2015, indicate the owners are Harlow Higinbotham & Susan E. Higinbotham – Joint by Entireties." The statements do not indicate they are "husband and wife" and even use the word "joint."  *Id.* The Northern Trust Margin Account statements thus indicate a joint tenancy and not a tenancy by the entirety.  The Debtor and his wife must have realized this defect because the statements were changed in December of 2016 to "Harlow Higinbotham & Susan E. Higinbotham -- Tenants by Entirety," although the statements still do not state that they are "husband and wife."  Thus, even if New Jersey law did apply (which it does not), the Northern Trust Margin Account is not held in a tenancy by the entirety.  The language used is not sufficient language, under New Jersey law, to create a tenancy by the entirety in the subject personal property.

Second, under New Jersey law, the husband and wife have to *take title* to the personal property under a written instrument that creates the tenancy by the entirety.  In this case, there is no indication the Debtor and his wife acquired the Northern Trust Margin Account in tenancy by the entirety or that there is a written instrument conveying the property into tenancy by the entireties.  *Dzikowski v. Kirshner (In re Kirshner)*, 2007 Bankr. LEXIS 3779, at *22 (Bankr. S.D. Fla. Oct. 30, 2007) (rejecting argument that personal property was held in tenancy by the entirety under New Jersey law because "the Debtor has produced no written instrument, as required by N.J.S.A. § 46:3-17.2, to show that the Debtor and his non-filing spouse *acquired* the subject personal property as tenants by the entireties") (emphasis supplied).

Finally, even if the Northern Trust Margin Account were held in tenancy by the entirety, such transfer would be avoidable under 11 U.S.C. § 544 and/or § 548 and applicable state law. *See* 740 ILCS 160/1 *et seq.* A transfer of this account into tenancy by the entirety cannot be anything other than a transfer designed to hinder, delay and defraud the Movants. It has multiple indicia of fraud, including a transfer to an insider for no consideration at a time when the Debtor knew he would have to pay a sizeable child support obligation. Furthermore, the Debtor continued to enjoy use of the subject property, which is another badge of fraud. *Id.* at 160/5(a) And unlike the tenancy by the entirety in homesteads under Illinois law, the transfer of the Northern Trust Margin Account can be avoided as a fraudulent conveyance under the Uniform Fraudulent Transfer Act. *Jimenez v. Jimenez*, 454 N.J. Super. 432, 439, 185 A.3d 954, 958 (Super. Ct. App. Div. 2018) ("we do not preclude a remedy by a creditor against property held by tenants by the entirety when the title was deeded as a fraudulent conveyance in order to avoid known debts to creditors. *See N.J.S.A.* 25:2-1 to -6 (the fraudulent conveyance statute).")

## 3.2. The Joliet Property is not exempt because it is not the Debtor's homestead.

Schedule C also erroneously asserts that the Debtor's interest in the property in Joliet, Illinois (which is worth almost $4 million, according to the Debtor) (the "***Joliet Property***") is held in tenancy by the entirety and is thus exempt under 735 ILCS 5/12-112. That statute provides that:

> Any real property… held in tenancy by the entirety shall not be liable to be sold upon judgment entered on or after October 1, 1990 against only one of the tenants, *except if the property was transferred into tenancy by the entirety with the sole intent to avoid the payment of debts existing at the time of the transfer beyond the transferor's ability to pay those debts as they become due.*

735 ILCS 5/12-112 (emphasis supplied)

A tenancy by the entirety is created only,

> Whenever a devise, conveyance, assignment, or other transfer of homestead property maintained or intended for maintenance as a homestead by both husband and wife together during coverture shall be made and the instrument of devise, conveyance, assignment or transfer expressly declares that the devise or conveyance is made to persons, named and expressly identified in that instrument as husband and wife, not as joint tenants or tenants in common but as tenants by the entirety, the estate created shall be deemed to be in tenancy by the entirety.

*Travelers Indem. Co. v. Engel*, 892 F. Supp. 206, 207 (N.D. Ill. 1995), *aff'd*, 81 F.3d 711 (7th Cir. 1996) (*citing* 765 ILCS 1005/1c). If the subject property does not satisfy certain conditions to qualify for the exemption, tenancy is either in common or joint and thus the debtor's interest is property of the estate. 11 U.S.C. § 541.

In this case, the Joliet Property is not held in tenancy by the entirety because (a) it is not the Debtor's homestead, (b) the Debtor asserts that he and his wife are estranged, and (c) the tenancy by the entirety was created solely to hinder, delay and defraud creditors and is thus void.[7]  *In re Giffune*, 343 B.R. 883, 889 (Bankr. N.D. Ill. 2006) ("An estate held in tenancy by the entirety, however, is limited to 'homestead' property held by a husband and wife 'during coverture.' 765 ILL. COMP. STAT. 1005/1c."); *Jaffe v. Williams*, No. 17 CV 4662, 2018 U.S. Dist. LEXIS 85388, at *5-6 (N.D. Ill. May 22, 2018) ("In Illinois, a tenancy in the entirety exists 'only if, and as long as, the tenants are and remain married to each other,' and only for as long as the married couple use the property as their 'homestead.' 765 ILCS 1005/1c.").

First, the Joliet Property is not the Debtor's homestead because his primary residence is 1500 N. Lake Shore Drive.  The Debtor testified at his 341 meeting that

---

[7] Further discovery may show that the Debtor and his wife have joint creditors, in which case, the tenancy by the entirety may be severed under 11 U.S.C. § 544 or other provisions of the Bankruptcy Code.

he and his wife mostly reside in their condominium at 1500 N. Lake Shore Drive –
i.e., he spends most of the week at this address and only visits the Joliet property on
some weekends.[8]  This severs the tenancy.  *See Loventhal v. Edelson*, 844 F.3d 662,
664 (7th Cir. 2016) ("Divorce and moving to another primary residence also sever
the tenancy by the entirety.").  Additionally, the promissory notes the Debtor signed
in favor of his residuary trust list his address as 1500 N. Lake Shore Drive, and the
related loan agreement specifically states "Harlow N.  Higinbotham (hereinafter the
'Borrower') of 1500 N. Lake Shore Drive Apartment 13-C."  Similarly, the motion to
withdraw an appearance as counsel to Susan Higinbotham, lists her address at
1500 N. Lake Shore Drive and indicates the notice was given "via hand delivery."

Perhaps even more telling is the motion the Debtor's attorneys filed two weeks
ago related to the checks that The Northern Trust issued.  That motion was served
upon the Debtor via United States Mail at 1500 N. Lake Shore Drive.  *See* Dkt. No.
65. Likewise, the Debtor's account statements from the Northern Trust list his
address and his wife's address at 1500 N. Lake Shore Drive.

All of the above, as well as other facts to be determined at hearing, establish
that the Debtor's and his wife's primary residence and thus homestead lies at 1500
N. Lake Shore Drive and not in the Joliet Property and that the Debtor and his wife
have sufficiently abandoned the Joliet Property to take it outside the realm of their

---

[8] Tr. of 341 Meeting, at 43:

> MR. PAULSEN: "okay. How often would you say you
> stayed at the condo or at the co-op?
>
> MR. HIGINBOTHAM: Most weeknights.
>
> MR. PAULSON: Okay. How about on the weekends?
>
> MR. HIGINBOTHAM: Weekends, when I can I get down
> to the farm. … Most weekends I drive there.
>
> MR. PAULSON: Okay. Where does your wife stay most of
> the time?
>
> MR. HIGINBOTHAM: Mostly downtown.

homestead. *See In re Mooner,* 188 B.R. 25, 27 (Bankr. N.D. Ill. 1995) ("The right of homestead is created by statute, not founded in common law.") (*citing* 20 *Illinois Law and Practice,* Homesteads § 2 (1992)). "The purpose of the estate of homestead and the exemption is to secure the debtor and his family the necessary shelter from creditors." *Id.* "One way for the homestead exemption to be lost, other than by conveyance or release, is by abandonment. *Id.* at §§ 54-55." *Id.* "Generally, a removal from the homestead premises will be taken as an abandonment unless it clearly appears that there was an intention to return and occupy them. *Id.* *See also Rasmussen v. Rasmussen,* 368 Ill. 137, 140, 13 N.E.2d 166, 168 (1938); *Dinquel v. Dacco,* 273 Ill. 117, 121, 112 N.E. 337, 339 (1916)." *Id.* The property at 1500 N. Lake Shore Drive is thus the homestead for the Debtor and his wife and title to that property is not held in a tenancy by the entireties between the Debtor and his wife.

Additionally, the tenancy by the entirety is not properly claimed here because the Joliet Property originally was owned solely by the Debtor, but was transferred into the tenancy by the entirety in late September of 2009, just weeks after the Debtor's wife learned about the Debtor fathering three boys with Wipaporn Teekhungam. Given the timing of the transfer—i.e., shortly after the debtor's wife learned about his three sons—and the fact that the Joliet Property had always been in the Debtor's name during the marriage between the Debtor and his wife, the sole basis for transferring it was to avoid paying the Debtor's debts to his children. *Id.* The Movants need additional information about certain of the Debtor's exemptions and thus object to the designation of such items on Schedule C.

The Debtor asserts that several items of property are exempt, but the Movants do not have the underlying documentation needed to analyze and evaluate whether such property qualifies for the designated exemption, and thus object to the exemption. A list of that property is included in the chart in section 2.3 above, with the basis for objection listed as "additional information needed for evaluation."

Accordingly, the Movants object to such exemptions at this time, pending further information from the Debtor.

Although the Debtor's Schedule C does indicate that his wife is the beneficiary of several insurance policies, the Movants are entitled to review the policies themselves to verify this. Further, they are entitled to review the policies to determine whether the Debtor transferred the beneficiary designation away from them, and when the Debtor's wife and his fourth child were designated a beneficiary. *See e.g., In re Currey*, 2018 Bankr. LEXIS 443, at *2-3 (2018) (noting that 5/12-1001 bars a debtor from converting nonexempt property into exempt property).

The Movants also are entitled to discovery on the Debtor's IRA and 401(k) plans to ascertain if such assets are qualified under applicable law. *See e.g., Clark v. Rameker*, 573 U.S. 122, 134 S. Ct. 2242 (2014) (inherited IRAs not exempt). All of this information is relevant to evaluating whether the property is exempt and, right now, there is uncertainty about the exempt status of such property. *See In re Slates*, No. EC-12-1168-KiDJu, 2012 Bankr. LEXIS 5159, 2012 WL 5359489, at *8-9 (BAP 9th Cir. Oct. 21, 2012) (construing ambiguity against the debtor and explaining that "ambiguous and imprecise" exemption claims were not automatically exempt when no timely objection was filed). The Movants requested some of this information at the Debtor's 341 meeting, but have not yet received it. Presumably, such information will be provided in the Debtor's discovery responses or through a voluntary exchange from counsel.

The Debtor's claimed exemptions are either not available to him or are not supported by adequate information at this time.

**Wherefore**, Teekhungam and the children respectfully request that the Court disallow the Debtor's exemptions and grant such further relief as is appropriate in the circumstances.

Dated: February 11, 2019

Respectfully submitted,

**Wipaporn Teekhungam**, **A.H**, a minor, **A.H.**, a minor, and **A.H.**, a minor

By: /s/ William J. Factor
One of Their Attorneys

William J. Factor (6205675)
Deborah K. Ebner, Of Counsel (6181615)
Jeffrey K. Paulsen (6300528)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel:     (847) 239-7248
Fax:     (847) 574-8233
Email: wfactor@wfactorlaw.com
        dkebner@deborahebnerlaw.com
        jpaulsen@wfactorlaw.com

# Exhibit A

1

2

3

4

5

6    IN RE HARLOW HIGINBOTHAM

7    CASE NO.:18-31185

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. WOLF:  Okay.  Good afternoon.  We are here for

2     the first meeting of creditors in the Harlow Higinbotham

3     bankruptcy case.  Case number 18B31185.

4          Present up here today with me is the debtor,

5     Mr. Higinbotham.  If I mispronounce your name, I apologize.

6     I mean no disrespect, but it's probably going to happen.

7          Also here today on behalf of the debtor is

8     Mr. Gregory Stern and Monica O'Brien, counsel for the

9     debtor.

10          Sir, as your attorneys no doubt explained to you,

11     the purpose of this meeting is to give US Trustee an

12     opportunity to examine you under oath concerning the facts

13     and circumstances surrounding this bankruptcy case.  What

14     I'm going to do is ask a few questions, standard questions

15     that I ask in every case.  I'm going to go through the

16     petition schedules and statement of financial affairs and

17     ask some questions about those documents as well.

18          This is a meeting of creditors, so creditors are

19     also free to ask questions.  The only thing I ask is that if

20     you do ask a question, can you please state your name first,

21     that way if somebody wants to get this recording typed up we

22     know who it's who is asking the question.

23          I also note that I've gotten a request regarding

24     the time length of this meeting.  There's some people with

25     doctors appointments at 3:30, so I'm going to try my best to

1   accommodate them, but also I'm not going to cut the meeting

2   short either.

3            Before we begin, Ms. O'Brien or Mr. Stern, is there

4   anything you'd like to say by way of opening comments?

5            MR. STERN:  No.

6            MS. O'BRIEN:  No.

7            MR. WOLF:  Sir, would you please raise your right

8   hand.

9            Do you solemnly swear the testimony you're about to

10  give will be the truth, the whole truth and nothing but the

11  truth under the penalty of perjury.

12           MR. HIGINBOTHAM:  I do.

13           MR. WOLF:  You could place your hand down.

14           Would you please state your name and spell it

15  please.

16           MR. HIGINBOTHAM:  Harlow Niles Higinbotham,

17  H-A-R-L-O-W  H-I-G-I-N-B-O-T-H-A-M.

18           MR. WOLF:  Thank you very much.

19           I'll note that this case was filed on November 5th,

20  a little over a month ago.  There had been some activities

21  in court and we've got a motion to employ counsel, which is

22  up tomorrow, but which I understand was settled over to

23  Thursday.  There's also a motion to modify the automatic

24  stay pending before Judge Hunt.

25           MR. STERN:  The motion is set claim to bar day.

1          MR. WOLF:  Motion is set claim to bar day, I saw

2     that come in too.

3          Sir, I know you were here on November 14th for what

4     we call an initial debtor interview.

5          MR. HIGINBOTHAM:  Yes.

6          MR. WOLF:  And you gave us a good amount of

7     information.  At the end of that meeting we asked for a copy

8     of insurance covering your Joliet property and also the

9     vehicles that you own as well.  Checking our file, I didn't

10    see it in there, but I think Ms. O'Brien --

11         MS. O'BRIEN:  That is correct.  We have the -- I

12    have the certificates in my office and I'll e-mail them over

13    to you this afternoon.

14         MR. WOLF:  Thank you.

15         And, sir, is all the property that belongs to you

16    both personal property and real property covered by

17    insurance?

18         MR. HIGINBOTHAM:  All the property that we're going

19    to be talking about, yes.  Yes.

20         MR. WOLF:  All right.  I sometimes ask a few

21    questions about what brought us here today, but I think I

22    know the answer of that and I think the parties here are

23    pretty familiar with that as well, so I'm going to skip over

24    that, what I'm going to do, but...

25         Sir, I'm going to hand you a copy of a petition

1    that was filed in this case on November 5th and it looks

2    like on November 6th there was an amended list of 20 largest

3    creditors filed and now we had schedules -- an initial set

4    of schedules filed on November 19th and then yesterday we

5    got or we received a set of certain amended schedules and an

6    amended statement of financial affairs.

7            What I'm going to ask you to do is if you would

8    take a moment, review these documents, if you haven't

9    already.  What I need to know is whether all the answers to

10   all of questions in the petition, the amended list of 20

11   largest creditors, the schedules as amended and the amended

12   statement of financial affairs, it's kind of a long

13   question, but are all of the answers to all of the questions

14   in those documents true?

15           MR. HIGINBOTHAM:  I believe in the original

16   petition I may have done some things that may have been

17   clarified subsequently, so I'm not sure.  There may be some

18   inconsistencies there between the original petition and the

19   schedules, in which case the schedules should be considered

20   as true.

21           MR. WOLF:  Okay.  So the amended schedules --

22           MR. HIGINBOTHAM:  Yes.

23           MR. WOLF:  -- the ones that were amended, plus the

24   original schedules, plus the amended statement of financial

25   affairs.

1          MR. HIGINBOTHAM:  Yes.

2          MR. WOLF:  And I may have asked that question a

3     little bit inartfully, but...

4          MR. HIGINBOTHAM:  Everything as it stands today

5     amended is true.

6          MR. WOLF:  Great.  Thank you very much.

7          Did you list all the property that you owned on

8     your Schedule A/B, both personal and real?

9          MR. STERN:  The answer is yes.

10          MR. HIGINBOTHAM:  Yes.  This is the original --

11               (LOW SPEAKING)

12          MR. WOLF:  Okay.  Turning to Schedule A/B property.

13     In response to question 1.1, you see some real property

14     listed on Cass Street in Joliet.

15               (LOW SPEAKING)

16          MR. WOLF:  And I believe that was one of the --

17     that was one of the schedules that got amended.  So let's

18     make sure we're looking at the same ones.  I've got the

19     current ones?

20          MS. O'BRIEN:  Yes.

21          MR. STERN:  Yes.

22          MR. WOLF:  First off, I would note that it looks

23     like the valuation of the property declined, was $2.9

24     million dollars on the original Schedule A and it's now

25     reads $1.98 million dollars.  Can you explain what happened

1    there?

2          MR. HIGINBOTHAM:  Well, there are two things.

3          One was there was a computational error on the part

4    of me and my attorney in computing the first number and that

5    error has been fixed.

6          And, secondly, we reconsidered the value of some of

7    the farmland that's not farmable, I believe as it stands

8    currently, and so we reevaluated some of the land, but in

9    addition there was an error in the way we did our initial

10   calculations.

11         MR. WOLF:  Okay.  Just so I'm clear, your belief is

12   the current value of the entire property is about $1.9

13   million dollars?

14         MR. HIGINBOTHAM:  That's very much an estimate, but

15   yes.

16         MR. WOLF:  Okay.

17         And what did you base that estimate on?

18         MR. HIGINBOTHAM:  I based it on a value of the

19   farmland, the other land and the improvements to the house

20   fundamentally.

21         MR. WOLF:  Okay.

22         MR. HIGINBOTHAM:  There is the two houses; the main

23   house and a smaller house.

24         MR. WOLF:  And you also described the property as

25   being held in tenancy by the entirety.  Can you tell me how

1    long it's been held in that form?

2         MR. HIGINBOTHAM:  I think since some time in

3    2009 -- early 2009 my recollection.

4         MR. WOLF:  And I'm going to ask you this, I'm going

5    to ---I have a little checklist of documents that I'm going

6    to ask for by way of follow-up and one thing is I would like

7    to see a copy of the deed or some evidence that that is

8    indeed how in tenancy by the entireties.

9         Thank you.  I'm going to set that aside right now.

10        I can keep this?

11        MR. STERN:  It's yours.

12        MR. WOLF:  So this does say quick claim deed

13   tenancy by entirety and it looks like it was recorded in

14   2009.

15            (LOW SPEAKING)

16        MR. WOLF:  November 18, 2009, so, thank you.

17        Sir, aside from the Mercedes Benz and the Silverado

18   listed on Schedule B do you own any other vehicles?

19        MR. HIGINBOTHAM:  No.

20        MR. WOLF:  In response to question 6, household

21   goods and furnishings, you have $137,500 worth of property

22   listed there and I just want to make sure I understand that

23   number correctly.  The question calls for debtors to

24   disclose the current value of the property you own and

25   you've got sort of in the detailed section here you say,

Page 9

1    "It's subject to the claims of Susan Higinbotham."   Is

2    the -- what is the total value of the household goods?

3              MR. HIGINBOTHAM:   Total value would be twice that

4    number, would be $175,000.

5              MR. STERN:   It would be $275.

6              MR. HIGINBOTHAM:   $275,000, right.

7              MR. WOLF:   So, the actual value is $275,000 and are

8    you saying here that Susan has a half interest in that.

9              MR. HIGINBOTHAM:   Well, she actually owns all of

10   it, but I, you know, in the interest of full disclosure I'm

11   including half.

12             MR. WOLF:   But the total value is about $275,000,

13   approximately?

14             MR. HIGINBOTHAM:   That's correct.   Yes.

15             MR. WOLF:   And how did you arrive at that value,

16   sir?

17             MR. HIGINBOTHAM:   My personal estimates, item by

18   item, going through the items listed there and making my

19   best assessment is what the value is, market value.

20             MR. WOLF:   In response to question 8 there is a

21   coin collection listed there at about $12,500 owned jointly

22   with your sister, is that also adjusted?

23             MR. HIGINBOTHAM:   That's half the total.   Again,

24   it's an estimated value for the total.

25             MR. WOLF:   And you're confident that that's all the

Page 10

1    coin collection is worth?

2            These are collectibles, they're not Kruger rings?

3            MR. HIGINBOTHAM:  They're collectibles, but they're

4    not, you know, that's my estimate based on what I had time

5    to do, yes.

6            MR. WOLF:  Where are those located, sir?

7            MR. HIGINBOTHAM:  They're in a safety deposit box

8    at the Northern Trust.

9            MR. WOLF:  And the same question with respect to

10   the other collectibles listed there with a value of

11   $834,000, is that an adjusted figure as well?

12           MR. HIGINBOTHAM:  Yes.

13           MR. WOLF:  What would be the gross value, sir?

14           MR. HIGINBOTHAM:  It would be twice that amount.

15   It would be $1 million 68.

16           MR. WOLF:  And same thing there, did you have any

17   of those items appraised or how did you come up with that

18   number?

19           MR. HIGINBOTHAM:  In some cases there are -- we

20   have information listed in insurance filings in terms of --

21   I think I had a collection of prints that I have pretty good

22   cost information on.

23           MR. WOLF:  Okay.  Where are these items located?

24           MR. HIGINBOTHAM:  Most of these are located in an

25   apartment here in Chicago.  Not all of them.

1           MR. WOLF:  Okay.

2           MR. HIGINBOTHAM:  They're here at the Chicago or

3    Joliet property.

4           MR. WOLF:  Are most of them in Chicago or?

5           MR. STERN:  Most of what?

6           MR. WOLF:  The personal property that we're talking

7    about.

8           MR. STERN:  Well, the prints are mostly in Chicago,

9    if I'm not mistaken; is that correct?

10          MR. HIGINBOTHAM:  That's correct, yes.

11          MR. WOLF:  I'm just going to show you a copy of

12   this insurance certificate that we got through your counsel

13   and it just talks about personal property and, I believe,

14   it's got a value of $500,000.  Is that the same personal

15   property we're talking about that's worth maybe 1.6.

16          MR. HIGINBOTHAM:  Could be.

17          MR. WOLF:  So is it underinsured?

18          MR. HIGINBOTHAM:  Well, not everything is

19   scheduled, that's correct.  So there's -- I'd have to look

20   at the policy to tell you what's --

21          MR. WOLF:  Okay.  I'm going to ask you to do that

22   and then maybe communicate that with Mr. Stern or

23   Ms. O'Brien because we do need everything to be adequately

24   insured here.

25          Okay.  Sir, tell me if I'm wrong, but I see

1   firearms listed here with a value of $28,500, that price is

2   or that value has been adjusted down to reflect Susan's

3   ownership interest in them; is that correct?

4           MR. HIGINBOTHAM:  Yes, it's half the total.

5           MR. WOLF:  Turning towards the section that talks

6   about deposits of money and focusing on the Northern Trust

7   account, response to question 17.2.

8           It looks like that amount, the $10 million dollar

9   figure on the amended Schedule A/B, is adjusted up from

10  about, I'm rounding off, $5 million dollars on the original

11  Schedule A/B.  Can you just explain what happened there,

12  sir?

13          MR. HIGINBOTHAM:  We corrected the valuation to

14  reflect the tenancy by entirety.  We did not multiply it by

15  50 percent the way any of the other numbers are multiplied.

16          MR. WOLF:  All right.  I understand that you've

17  claimed that as exempt under New Jersey law; is that

18  correct?

19          MR. HIGINBOTHAM:  Yes.

20          MR. WOLF:  With respect to the Vanguard account,

21  the Morgan Stanley account --

22                    (LOW TALKING)

23          MR. WOLF:  -- the UBS account and the two Fidelity

24  accounts, how are those owned?  Individually by you, sir?

25          MR. HIGINBOTHAM:  All those, I believe, are owned

1    by me individually, yes.

2         MR. WOLF:  So, I had spoken to Ms. O'Brien briefly

3    before the meeting and what I'd like to do is I've got to

4    verify that the Northern account is indeed held by tenancy

5    by the entirety, so I'll take a look at that.  But then

6    also, too, do we have say a summary page from the other

7    accounts?

8         MR. STERN:  Most of them.

9         MS. O'BRIEN:  Nope.  I gave you the summary pages

10   on the retirement accounts.

11        MR. WOLF:  Okay.

12        MS. O'BRIEN:  If you want me to give you -- I can

13   send you over the front page on these individual accounts,

14   if you need them.  I didn't know that you needed those.

15        MR. WOLF:  Let's set that question -- let me take a

16   look at those too.

17        MS. O'BRIEN:  Okay.

18        MR. WOLF:  Just to make sure they're not qualified

19   accounts.

20        MS. O'BRIEN:  Okay.

21        MR. WOLF:  Or maybe they are.

22        MS. O'BRIEN:  Okay.

23        MR. WOLF:  And, sir, turning to question 18, the

24   publicly traded stocks that are listed there, are those all

25   held in your name individually?

1          MR. HIGINBOTHAM:  Yes, they are.

2          MR. WOLF:  And looking at question 19, talks about

3    non-publicly traded stocks or interest incorporated or

4    unincorporated businesses and you've got the answer -- no

5    boxes are checked there, is that a true answer?

6          MR. HIGINBOTHAM:  Yes.

7          MR. WOLF:  Do you have any ownership interest in an

8    entity called Chicago 2000 Partners?

9          MR. HIGINBOTHAM:  No.

10          MR. WOLF:  And Ms. O'Brien, I'm sure I'm repeating

11    myself, but these retirement accounts --

12          MR. STERN:  Those are in there.

13          MALE VOICE:  Those were the front page?

14          MS. O'BRIEN:  Yes.  Yes.

15          MR. WOLF:  And, sir, turning to question 25,

16    interests and trusts.  There is a residual interest in the

17    E.D. Higinbotham Trust, the value is zero.  I understand

18    from the statement of financial affairs you're the trustee

19    of that trust; is that correct?

20          MR. HIGINBOTHAM:  That's right, yes.

21          MR. WOLF:  And you're trustee of the other two

22    trusts listed there as well?

23          MR. HIGINBOTHAM:  I'm co-trustee of the Rosenberg

24    Trust.  I'm sole trustee of Higinbotham Trust.

25          MR. WOLF:  And with respect to the E.D. Trust,

Page 15

1    could you tell me who the beneficiaries are?

2              MR. HIGINBOTHAM:  Beneficiary is my sister, Susan

3    Mennis.

4              FEMALE VOICE:  I'm sorry, I couldn't hear the

5    answer.

6              MR. HIGINBOTHAM:  Susan Mennis, M-E-N-N-I-S.

7              MR. WOLF:  And could you just explain your residual

8    interest, what is that?

9              MR. HIGINBOTHAM:  On her death the remainder is

10   divided amongst remaining siblings and/or subsequent heirs.

11             MR. WOLF:  Who was E.D.?

12             MR. HIGINBOTHAM:  E.D. was my mother.

13             MR. WOLF:  Okay.

14             And do you have a rough idea of the, say, net value

15   of the property owned by that trust?

16             MR. HIGINBOTHAM:  I believe it's on our schedule

17   that we have here, rather than just guessing.

18             MR. STERN:  Look back in the statement of financial

19   affairs, it's set forth in our answer to question number 23.

20             MR. WOLF:  What is it?

21             MR. STERN:  So let's just look at 23.

22                  (CROSS TALKING)

23             MR. STERN:  Okay.  What was your question?  In the

24   statement of financial affairs E.D. was listed 4436016.63.

25             MR. WOLF:  My question was how much is the rest of

Page 16

1   the trust is worth.  You have $4.4 million, I see that,

2   okay, and you have a residual interest in that it sounds

3   like.

4            MR. HIGINBOTHAM:  Yes.

5            MR. WOLF:  And how about the H.N. Trust, who are

6   the beneficiaries of that trust?

7            MR. HIGINBOTHAM:  That's a very similar setup.  My

8   sister, Susan, being the sole beneficiary at present.  On

9   her death it would pass to the remaining siblings.

10           MR. WOLF:  And who was H.N.?

11           MR. HIGINBOTHAM:  My father.

12           MR. WOLF:  And could you describe your interest in

13  the Rosenberg Irrevocable Trust, please.

14           MR. HIGINBOTHAM:  I believe I have a residual

15  interest in the event that both the beneficiaries, which are

16  my niece and nephew and all of their children, are deceased.

17           MR. WOLF:  And who's the co-trustee on that trust?

18           MR. HIGINBOTHAM:  My brother-in-law, Carl

19  Rosenberg.

20           MR. WOLF:  In response to question 33, claims

21  against third parties, you checked the box "yes", but you

22  characterize the claims as "unknown".  Can you just explain

23  what that means?

24                    (LOW TALKING)

25           MR. HIGINBOTHAM:  I do not have specific claims

Page 17

1    against anyone that I could define.

2                    (LOW TALKING)

3            MR. WOLF:  Aside from that, the sanctions claim.

4            MR. HIGINBOTHAM:  I don't have anything

5    specifically in mind.

6            MR. WOLF:  And turning to question 35.  We've got

7    the shares in 1500 North Lakeshore Drive, the unit there.

8    Can you tell me when you purchased that, sir, approximately?

9            MR. HIGINBOTHAM:  I'm trying to think.  It was

10   1995.

11           MR. WOLF:  And do you recall, approximately, how

12   much you paid for it?

13           MR. HIGINBOTHAM:  A little under a million dollars,

14   900 and something.

15           MR. WOLF:  And is that a co-op?

16           MR. HIGINBOTHAM:  It's a co-op, yes.

17           MR. WOLF:  And is your ownership interest

18   represented by shares, like stock certificates?

19           MR. HIGINBOTHAM:  Yes, we have shares.

20           MR. WOLF:  Okay.  And do the shares reflect the

21   joint tenancy with the non-filing spouse on them, do you

22   know?

23           MS. O'BRIEN:  You have them.

24           MR. WOLF:  They're in here?

25           MR. HIGINBOTHAM:  Yes.

1           MR. WOLF:  Okay.

2           MR. HIGINBOTHAM:  I would suggest, yes, they do.

3           MR. WOLF:  All right.  I will double-check that.

4           MR. STERN:  Thank you.

5           MR. WOLF:  We will he keep going though.  We'll

6    keep going here.

7           MR. STERN:  It's underneath that one.  It's in that

8    stapled package on top.

9           MR. WOLF:  All right.

10          Schedule C, I do see some significant property

11   listed here as being exempt, certainly the retirement

12   accounts and the Cass Street property in Joliet.  We will be

13   verifying with the paperwork that those are held either in

14   either tenancy by the entirety or they are indeed qualified

15   requirement accounts.

16          I'm going to go back to your original Schedule D

17   that was filed, because that was not amended.

18          There's a relatively small security claim listed

19   for -- against 1500 Lakeshore Drive, about $10,000, can you

20   explain that, sir?

21          MR. HIGINBOTHAM:  My recollection is that was the

22   -- a monthly assessment.

23          MR. WOLF:  That would have been, what, the November

24   assessment?

25          MR. HIGINBOTHAM:  No.  It would have been October,

1    I think.  October bill payable in November, something like

2    that.

3         MR. WOLF:  And you got Northern Trust listed as a

4    secured creditor, visa a vis, the brokerage account with

5    about $10.6 million dollars in it.

6         Let me just backup.

7         This account is owned in tenancy by the entirety;

8    is that correct?

9         MR. HIGINBOTHAM:  Yes, that's correct.

10        MR. WOLF:  And what's the nature of that secured

11   claim?  What brought it about?  Was it a loan of some sort?

12        MR. HIGINBOTHAM:  Yeah, it's a margin loan.

13        MR. WOLF:  And how is that recorded?  How is that

14   perfected?

15        MR. HIGINBOTHAM:  I'm trying to understand the

16   question.

17        MR. WOLF:  How is the secure and interest created?

18        MR. STERN:  The answer is it's a marginal account

19   at Northern Trust.

20        MR. WOLF:  So by virtue of their possession of

21   account we're saying they're secured?

22        MR. STERN:  I believe that's correct.

23        MR. HIGINBOTHAM:  Fidelity is involved somewhere in

24   the chain, I think.

25              (LOW TALKING)

1         MR. STERN:  Mr. Rug (phonetic) can help you on that

2    later on, if you want.  He's more than happy.

3         MR. WOLF:  And sticking with the original Schedule

4    D.  Are the real estate taxes current on the Joliet

5    property, sir?

6         MR. HIGINBOTHAM:  Yes.

7         MR. WOLF:  On Schedule E/F, and we're still with

8    the -- we're back at the originals, because these weren't

9    amended.

10        MR. STERN:  We're there.

11        MR. WOLF:  I do see some significant claims Whip,

12   Born, Teak and Gom (phonetic) and the claim for Veramim

13   (phonetic), LLP, sir, what was that for?

14        MR. HIGINBOTHAM:  That is for legal services.

15        MR. WOLF:  In connection with what?

16        MR. HIGINBOTHAM:  It's the -- I don't know what you

17   call.

18        MR. STERN:  Support proceedings?

19        MR. HIGINBOTHAM:  Support proceedings in the

20   Circuit Court.

21        MR. WOLF:  State Court proceedings?

22        MR. HIGINBOTHAM:  Yes.

23        MR. WOLF:  And turning to Page 20 of 31, up at the

24   top, it's Page 4 of 8 of the document itself, question 4.8

25   it refers to the E.D. -- I'll call it the E.D. Trust as a

Page 21

1   creditor for about $1.7 million dollars, I'm rounding it.

2            MR. HIGINBOTHAM:  Uh-huh.

3            MR. WOLF:  Can you just explain what that is about?

4            MR. HIGINBOTHAM:  That was a -- well, from the

5   trust to me, the notes.

6            MR. WOLF:  And when did that take place?

7            MR. HIGINBOTHAM:  It took place over several

8   different timings over several years.

9            MR. WOLF:  The question says, "When was the debate

10  incurred," it's blank, so do -- what was that timeframe,

11  roughly?

12           MR. HIGINBOTHAM:  Roughly over the last five years.

13           MR. WOLF:  And the answer also references

14  promissory notes.  Are there formal promissory notes from

15  you to the trust?

16           MR. HIGINBOTHAM:  Yes.

17           MR. WOLF:  I'm going to ask that you give copies of

18  those to Mr. Stern, please.

19           And I'm going to ask him to give them to me.

20           And then same sort of series of questions with

21  regard to question 4.11, the H.N. Trust, $4.6 million dollar

22  claim.  Approximately when was that?

23           MR. STERN:  I'm sorry.

24           MR. WOLF:  21 of 31 up at the top there.

25           When was that debt incurred?

1          MR. HIGINBOTHAM:  It would be the same time period,

2     the last five years.

3          MR. WOLF:  And what was the nature of the

4     transaction?  A loan?

5          MR. HIGINBOTHAM:  Yes, with notes somewhere.

6          MR. WOLF:  And what did you use the money for?

7          MR. HIGINBOTHAM:  Much of it was used for legal

8     fees.

9          MR. WOLF:  The majority of it?

10          MR. HIGINBOTHAM:  Majority of it, yes.

11          MR. WOLF:  $4 million of it?

12          MR. HIGINBOTHAM:  I can't -- I haven't done the

13     accounting.

14          MR. STERN:  Well, $1.9 was used to fund the 5032

15     Trust, wasn't it?

16          MR. HIGINBOTHAM:  Yes.  Right.  So that's the

17     majority there.

18          MR. WOLF:  Okay.  So for the E.D. loan and the H.N.

19     loan --

20          MR. HIGINBOTHAM:  Yes.

21          MR. WOLF:  -- it's safe for me to assume that most

22     of that money is related to what we'll call a State Court

23     litigation?

24          MR. HIGINBOTHAM:  I would say much of it.  I don't

25     know where you would draw the line between much and most,

1    but somewhere in that range, yes.

2            MR. WOLF:  Where would you draw the line; 80

3    percent, 70 percent?

4            MR. HIGINBOTHAM:  Something like that, yes.  That's

5    probably correct, yes.  It's very hard for me to have -- I

6    have not done an accounting of it, but that would be a

7    pretty good estimate.

8            MR. WOLF:  And then the remaining say 25 or 30

9    percent, approximately, so I guess we'd be talking about a

10   couple of million dollars, what was that spent on?

11           MR. HIGINBOTHAM:  Probably on living expenses and

12   things of that nature.

13           FEMALE VOICE:  And what?

14           MR. HIGINBOTHAM:  Things of that nature, excuse me.

15           MR. WOLF:  All right.  Let me follow up with your

16   counsel about to see what kind of records are out there in

17   connection with those --

18           MS. O'BRIEN:  We have the notes.  I'll get them to

19   you.

20           MR. WOLF:  All right.

21           And with respect to question 4.16.  You got Susan

22   Higinbotham listed there with promissory note and periodic

23   advances and then unknown amount and here we do have the

24   years -- the timeframe listed, 2018 and prior years.  I know

25   we got the periodic advances detailed in the statement of

1    financial affairs.  It looks like we've got notes, but we

2    don't know how much money was what her claim is.  Can you

3    tell me, approximately, sir, what that number would be?

4           MR. HIGINBOTHAM:  It would be something north of

5    $10 million, but I don't have a precise number.

6           MR. WOLF:  Okay.  That's between the advances and

7    the --

8           MR. HIGINBOTHAM:  Yes.

9           MR. WOLF:  And this $10 million that we'll use just

10   for the sake of discussion here, was that cash or what was

11   that?

12          MR. HIGINBOTHAM:  No.  It was a promissory note for

13   her help on various things.

14          MR. WOLF:  Can you provide a little bit more detail

15   of what kind of "help" we're talking about for that amount

16   of money?

17          MR. HIGINBOTHAM:  It was money that I felt that I

18   owed her for her staying with me and for taking care of --

19   helping me take care of these matters that are -- been my

20   main occupation for the past several years.

21          MR. WOLF:  Okay.  And how did you arrive at that

22   number, that $10 million dollars?

23          MR. HIGINBOTHAM:  I believe that it was a number

24   that she suggested and that I agreed with.

25          MR. WOLF:  So there was no money changed hands?

1   She didn't write you a check for a significant sum of money?

2   It was just personal services?

3          MR. HIGINBOTHAM:  It was consideration for her

4   services and support, yes.

5                    (LOW SPEAKING)

6          MR. HIGINBOTHAM:  There were some other transfers

7   back and forth between us, that's probably complicated, but.

8          MR. WOLF:  Okay.  But that debt was primarily for

9   what we would call services --

10         MR. HIGINBOTHAM:  Yes.

11         MR. WOLF: -- of some sort?

12         MR. HIGINBOTHAM:  Yes.

13         MR. WOLF:  Okay.

14         And let me ask you to do this, sir, if you could

15  also give copies of these notes to your attorneys and

16  they'll give copies of those notes to me as well.

17         And we've got Mr. Nelson listed as a party to a

18  share crop agreement in Joliet.  I take it he's a farmer?

19         MR. HIGINBOTHAM:  Yes.

20         MR. WOLF:  And how much does the agreement pay you

21  every year, approximately?

22         MR. HIGINBOTHAM:  It varies depending on what the

23  crop is, but $5 to $10,000 a year.

24         MR. WOLF:  Is that a fair market value for the --

25  his use of land?

1          MR. HIGINBOTHAM:  It's a share arrangement, share

2   property arrangement.  So it's whatever we -- we use a 50/50

3   splitting arrangement.  We split the revenues 50 percent.

4   We split the out-of-pocket, seeding, fertilizers 50 percent.

5   He does the farming.

6          MR. WOLF:  Okay.

7          MR. HIGINBOTHAM:  And we share the revenue.

8          MR. WOLF:  Is he a relative of yours?

9          MR. HIGINBOTHAM:  No.

10                (LOW TALKING)

11          MR. WOLF:  And sticking with the original

12   schedules.  On Schedule H we show Susan, I believe, as a

13   co-debtor on 1500 Lakeshore Drive; is that correct?

14          MR. HIGINBOTHAM:  I think that's correct, yes,

15   correct.

16          MR. WOLF:  I take that back, it's for Cass Ave --

17   no, excuse me, I was right the first time, Lakeshore Drive.

18          Is there some debt associated with 1500 Lakeshore

19   Drive?

20          MR. HIGINBOTHAM:  The only debt is the monthly

21   assessment.

22          MR. STERN:  But that's not what that entry goes

23   towards.  That goes towards 4.9 on the co-debt.

24          MR. WOLF:  All right.

25          MR. STERN:  Well, there's 2.1 is -- sure,

1  underneath, that's for the assessment and then on top of

2  that is the 4.9, which I take it is probably Northern Trust

3  --

4          MS. O'BRIEN:  No, it's Fox Rothschild.

5          MR. STERN:  Okay.

6          Excuse me, Fox Rothschild.

7          MR. WOLF:  Thank you, Ms. O'Brien.

8          MR. STERN:  Mr. Tobin's fees and Mr. Shaw's.

9          MR. WOLF:  I'm going to turn to the amended

10  Schedule J, and I just wanted to verify a couple of line

11  items here.

12          Question 4A, real estate taxes, we've got $1,500 a

13  month listed there for real estate taxes.  And can you

14  explain what that -- does that relate to both properties or

15  just one?

16          MR. HIGINBOTHAM:  I believe it's -- maybe it's --

17  probably both.

18          MR. STERN:  We believe it's just Joliet.

19          MS. O'BRIEN:  It is.

20          MR. HIGINBOTHAM:  Okay.  Just Joliet, right.

21          MR. WOLF:  Are there any real estate taxes

22  collected or assessed on the Lakeshore Drive property?

23          MR. HIGINBOTHAM:  It comes through the assessments.

24  Paid in the assessments.

25          MR. WOLF:  All right.  So the -- do you know,

1   approximately, how much the real estate taxes are say for

2   one year, for 1500.

3         MR. HIGINBOTHAM:  It's a rough guess that it's a

4   little less than half the assessment, but not much less.

5   The assessment is $9,000, $10,000 a year, it might be $4,000

6   or $5,000.  I could be wrong.

7         MR. WOLF:  So real estate taxes are about $50,000 a

8   year?

9         MR. HIGINBOTHAM:  Yes.

10         MR. WOLF:  Approximately?

11         MR. HIGINBOTHAM:  Yep.

12                (LOW TALKING)

13         MR. HIGINBOTHAM:  That sounds correct, yes.  You

14   can check the tax returns, find that very easily.

15         MR. WOLF:  And then question 8 on that same form,

16   Schedule J, we've got for childcare and children's education

17   cost $20,000 a month.  Could you tell me what that relates

18   to, sir?

19         MR. HIGINBOTHAM:  That relates to outside nursing

20   services for the health of our child.

21         MR. WOLF:  And this child is not involved in that

22   State Court situation.

23         MR. HIGINBOTHAM:  It's the child located in

24   Chicago.

25         MR. WOLF:  Okay.

1           And how old is he?

2           MR. HIGINBOTHAM:  He's 15 months going on 16.

3           MR. WOLF:  And how does that -- how is that $20,000

4    a month spent?

5           MR. HIGINBOTHAM:  It's mainly spent for nurses that

6    come in and take care of him at night or during the day or

7    whatever.

8           MR. WOLF:  So he has a full-time nurse?

9           MR. HIGINBOTHAM:  Not a full-time nurse.  He has

10   probably a governess of sorts that takes care of him and

11   then some people that come in and help.

12          FEMALE VOICE:  It's hard to hear you.

13          MR. HIGINBOTHAM:  Sorry.  It's a governess that

14   comes in at times and other people that help.

15          Did you hear that?

16          MR. STERN:  You can come sit with us, if you want.

17          MALE VOICE:  There's seats.

18          MR. WOLF:  Does he have any special needs?

19          MR. HIGINBOTHAM:  Nothing except love and support

20   that we all do.

21          MR. WOLF:  Okay.

22          I'm going to turn to the amended statement of

23   financial affairs that was filed late yesterday afternoon

24   and, sir, what were the -- what was the -- do you recall any

25   significant changes between this form and the original form?

1    What was the reason it needed to be amended?

2          MR. HIGINBOTHAM:  I need some help.  It may be just

3    one or two line items.  I'm not sure I can recall what it

4    was.

5          MS. O'BRIEN:  We had left out the Rosenberg

6    Irrevocable Trust.

7          MR. WOLF:  Okay.

8          MS. O'BRIEN:  And then trying to make sure we had

9    full disclosure we added that in there and I think there may

10   have been some spelling errors that I corrected when I did

11   the amendment as well.  But in terms of substance, it really

12   was just that one line item.

13         MR. WOLF:  Thank you, Ms. O'Brien.

14         And what she says is correct, sir?

15         MR. HIGINBOTHAM:  It sounds correct without -- I

16   mean, I could take the time to go through line by line and

17   validate that completely, but that sounds -- sounds correct,

18   yes.

19         MR. WOLF:  Okay.  And in response to question 5.

20   It talks about income in the two calendar years before 2018.

21   I do see a number of significant interest and dividend

22   payments.  If I go back to the tax returns for those two

23   years will those numbers match the figures set forth in the

24   tax returns?

25         MR. HIGINBOTHAM:  They should.  I haven't

1   cross-checked them, but I would hope they do.

2           MS. O'BRIEN:  That's where those numbers were taken

3   from.

4           MR. WOLF:  All right.  Thank you.

5               (CROSS TALKING)

6           MR. STERN:  You got packages of those returns?

7           MR. WOLF:  Yes.

8           And in response to question 7, I do see payments to

9   insiders within one year before the case was filed and I do

10  see some payments made to the E.D. Trust, the H.N. Trust and

11  then to Susan and these are all characterized as interest

12  payments.  I understand the interest payments on the E.D.

13  and H.N. Trust, but I'm a little confused about -- we have

14  interest payments to Susan on behalf of -- or generated by

15  services rendered; is that correct, sir?  Am I understanding

16  that right?

17          MS. O'BRIEN:  There's a promissory note.

18          MR. HIGINBOTHAM:  Promissory note.  There's a

19  schedule that exists somewhere, I probably have it

20  somewhere, that shows what that is, but it's interest

21  accrued on a promissory note and those are the payments made

22  with characterized interest.

23          MR. WOLF:  All right.  So she provided services.

24  You, I guess, assessed a value -- valued those services.

25  There was a note signed and then the note calls for interest

Page 32

1   on those services?

2        MR. STERN:  On the amounts due and the promissory

3   notes.

4        MR. WOLF:  Is that true, Mr. Higinbotham?

5        MR. HIGINBOTHAM:  I don't -- I'm -- I believe these

6   are relating to a promissory note that I wrote to her

7   several years earlier.  I can check the details.  I'm not

8   going to say it's related to services, but a promissory note

9   and there's interest due on that as specified in the note.

10        MR. WOLF:  Okay.  So it sounds like there might be

11   two notes; the services note and this earlier note?

12        MR. HIGINBOTHAM:  There was an earlier note for $4

13   million, as I recall, and it may well -- my understanding is

14   that may have been fully extinguished.

15        MR. WOLF:  Okay.

16        MR. STERN:  We'll provide you those notes.

17            (CROSS TALKING)

18        MR. HIGINBOTHAM:  We can go through that if you'd

19   like.

20        MR. WOLF:  That would be good.  If I can get maybe

21   a sort of an informal accounting just showing -- or maybe a

22   narrative.

23        MR. HIGINBOTHAM:  Yeah.

24        MS. O'BRIEN:  There's a full accounting available.

25   I can send it over.  It's a big sheet.

1           MR. WOLF:  All right.

2           MS. O'BRIEN:  So I'll get them to you.

3           MR. WOLF:  All right.

4           FEMALE VOICE:  Mr. Wolf, could that accounting be

5      available to the (inaudible).

6           MS. O'BRIEN:  I believe -- I think that has been

7      available in the Circuit Court case, but I'm happy to

8      provide what I have.

9           MR. WOLF:  Let me just mention for the creditors

10     that are here.  I will be getting some information from the

11     debtor.  I usually don't handout copies without the debtor's

12     permission because it's kind of personal stuff, but in the

13     spirit of corporation, I would expect that it would be

14     available to the creditor body, but...

15          MS. O'BRIEN:  Most of this information and the

16     documents have probably come from discovery that has taken

17     place in this court case.

18          MR. WOLF:  Okay.

19          MS. O'BRIEN:  So I don't think we'd have a problem

20     in sharing it.

21          FEMALE VOICE:  Thank you.

22          MR. WOLF:  Sir, have you ever set up a self-settled

23     trust?

24          MR. HIGINBOTHAM:  I'm not sure I know what it is.

25          MR. WOLF:  Okay.  Aside from the trust there listed

1    here, do you have any interests in any other trusts anywhere

2    in the world?

3              MR. HIGINBOTHAM:  We have a charitable trust that

4    we funded.  There's no interest in it.  It's purely going to

5    charity.

6              MR. WOLF:  All right.

7              MR. HIGINBOTHAM:  To the best -- I don't think

8    that's -- I'm not sure what a self thing --

9              MR. WOLF:  Well, I see Mr. Stern --

10             MR. STERN:  The question is, did you set up a

11   Harlow Higinbotham Trust yourself for the benefit of

12   anybody?  That would be a self-settled trust.

13             We haven't seen one.

14             MR. WOLF:  The question is, aside from the trusts

15   that are listed here, any other trusts that you have any

16   interest in as either a trustee or a beneficiary anywhere in

17   the world?

18             MR. HIGINBOTHAM:  Not as a trustee -- well, the

19   charitable trust I'm a trustee.

20             MR. WOLF:  Okay.

21             MR. HIGINBOTHAM:  So, I'm not a beneficiary of any

22   such other trusts.

23             MR. WOLF:  All right.  Let me just ask you to talk

24   to Mr. Stern about whether that charitable trust belongs

25   somewhere in these documents.

Page 35

1            You can -- we'll follow-up on that.

2            MR. HIGINBOTHAM:  All right.

3            MR. WOLF:  And then, sir, in response to question

4    21, and I think you mentioned earlier that you do rent a

5    safe deposit box; is that correct?

6            MR. HIGINBOTHAM:  Yes.

7            MR. WOLF:  And we got papers, coins and currency in

8    the safe deposit box?

9            The "coins", is that just the coin collection we

10   talked about earlier?

11           MR. HIGINBOTHAM:  Yes, it is.

12           MR. WOLF:  And the "papers", what type of papers

13   are those?

14           MR. HIGINBOTHAM:  Oh, I -- various Wills.

15           MR. WOLF:  Mirrored certificates?

16           MR. HIGINBOTHAM:  Old certificates, yes.  Yeah.

17   Nothing --

18           MR. WOLF:  And how about "currency", what is that?

19           MR. HIGINBOTHAM:  The coin collection would be

20   currency.

21           MR. WOLF:  So where it says coins comma currency.

22           MR. HIGINBOTHAM:  Okay.  I think there are some

23   silver certificates, something like that, some paper.

24           MR. WOLF:  Okay.  And the face value of that paper,

25   approximately?

1        MR. HIGINBOTHAM:  Oh, $100, $200, not much.  If it

2   was Confederate currency that might be a little more.

3        MR. WOLF:  All right.  Let me do this, let me just

4   take a second here.  I'm about done with my questions, but

5   just so Mr. Stern and Ms. O'Brien and I are on the same

6   wavelength, I think some of this material you may already

7   have given to me, but I was asking for any copies of the

8   Joliet insurance on the real estate and the vehicles that

9   Mr. Higinbotham owns.

10        Copies of the certificate, I'll call it a share

11   certificate, with respect to 1500, but you say it's in this

12   pile here.

13        MR. STERN:  Two of them.

14        MR. WOLF:  And then the Northern Trust account, a

15   Marsh & McLennan 401K, the Marsh & McLennan supplemental

16   saving account.

17        MR. STERN:  (Inaudible) pages from all the

18   accounts.

19        MR. WOLF:  And the Fidelity rollover and the

20   Fidelity Roth, they're either here or they're forthcoming.

21        MS. O'BRIEN:  And you also wanted me to send you

22   the front pages of all of his just individually held

23   accounts as well?

24        MR. WOLF:  Yes, let's do that.

25        MS. O'BRIEN:  Okay.

1           MR. WOLF:  And then I'm going to give Mr. Stern or

2    Ms. O'Brien a copy of what I'll call the E.D. note.

3           MR. STERN:  We already have those.

4           MR. WOLF:  The H.N. note.

5           MR. STERN:  And the Susan notes.

6           MR. WOLF:  And it looks like we may have two Susan

7    notes.

8           MS. O'BRIEN:  Susan notes and then accounting

9    related to the Susan notes.

10          MR. WOLF:  Great.

11          And we're going to check on the personal property

12   insurance, make sure everything is covered, because of a

13   little bit of a disparity between the amount on Schedule B

14   and what's listed on the insurance certificate.

15          And you're going to discuss with Mr. Stern whether

16   your involvement or position with that charitable trust

17   needs to be disclosed as well.

18          And Ms. O'Brien the insurance is probably the most

19   pressing one, although we will have a resumption deadline

20   starting to Ron Sole (phonetic), I guess the sooner the

21   better on all this stuff.

22          MS. O'BRIEN:  Depending on the time we get out,

23   although I do have to be somewhere, if I don't get it to you

24   today, I'll get it to you first thing in the morning.

25          MR. WOLF:  All right.  Good deal.  With the

1    insurance being the top of the list.

2          MS. O'BRIEN:  I can make the representation that

3    I've seen the insurance policies.

4          MR. WOLF:  Got you.  Great.  Okay.

5          With that are there any creditors who would like to

6    ask some questions?

7          Again, I just remind you if you do please state

8    your name first.

9          MR. PAULSON:  I'll go first, if that's ok?

10         MR. WOLF:  Sure.

11         MR. PAULSON:  Jeffrey Paulson for (inaudible) and

12   parties to minor children.

13         Sir, Mr. Wolf went through a bunch of the questions

14   that I had, so if you bear with me for a second.

15         Sir, earlier we were talking about the value of the

16   co-op in Chicago and there's value listed on the schedules,

17   do you remember that?

18         MR. HIGINBOTHAM:  Yes.

19         MR. PAULSON:  Okay.  And the value listed on the

20   schedules is $1.3 million or so?

21         MR. HIGINBOTHAM:  The value that's on the schedule

22   is $1.3 million, that's half.

23         MR. PAULSON:  That's half the value?

24         MR. HIGINBOTHAM:  That's half the value, yes.

25         MR. PAULSON:  So the other half is supposedly owned

Page 39

1   by Susan?

2            MR. HIGINBOTHAM:  All of them by Susan, but I'm

3   putting in half for disclosure purposes.

4            MR. PAULSON:  When you say it's "all of them by

5   Susan", what do you mean by that?

6            MR. HIGINBOTHAM:  Because I've given her

7   everything, but it's depending how you want to count it.

8   We're showing it as half.

9            MR. PAULSON:  You've given her "everything", what

10  do you mean by that?

11           MR. HIGINBOTHAM:  Everything.

12           MR. PAULSON:  All of your property?

13           MR. HIGINBOTHAM:  Yes.

14           MR. PAULSON:  You just gave it to her?

15           MR. HIGINBOTHAM:  Yes.

16           MR. PAULSON:  When?

17           MR. HIGINBOTHAM:  I don't know the exact date.

18  Within the last three years.

19           MR. PAULSON:  Within the last two years?

20           MR. HIGINBOTHAM:  I'd have to check schedules that

21  I can look at.  I can't from memory tell you something that

22  I wouldn't want to have to contradict later.

23           MR. PAULSON:  Was it within the last five years?

24           MR. HIGINBOTHAM:  Yes.

25           MR. PAULSON:  Why did you give her all your

Page 40

1   property?

2           MR. HIGINBOTHAM:  To keep our marriage together.

3           MR. PAULSON:  What do you mean by that?

4           MR. HIGINBOTHAM:  Just something I needed to do.

5           MR. PAULSON:  Was she threatening to divorce you?

6           MR. HIGINBOTHAM:  I wouldn't put it that way, you

7   know.

8           MR. PAULSON:  Was she going to leave you?

9           MR. HIGINBOTHAM:  I think I was concerned that she

10  would, yes.  I was -- it wasn't in response to a specific

11  statement on her part.

12          MR. PAULSON:  So how did this come up?  You just

13  decided one day to give her everything?

14          MR. HIGINBOTHAM:  Yes.

15          MR. PAULSON:  And no event in particular prompted

16  that?

17          MR. HIGINBOTHAM:  That's correct.

18          MR. PAULSON:  Did you write anything down?

19          MR. HIGINBOTHAM:  Yes.

20          MR. PAULSON:  What did you write down?

21          MR. HIGINBOTHAM:  That everything that I have is

22  yours.

23          MR. PAULSON:  Okay.  Did you file that with the

24  government at all?

25          MR. HIGINBOTHAM:  Not filed with anyone until we

1    appeared in court, in the Circuit Court case.

2              MR. PAULSON:  So this is a document that you

3    created; is that correct?

4              MR. HIGINBOTHAM:  Yes.

5              MR. PAULSON:  Okay.  And where did you store it?

6              MR. HIGINBOTHAM:  Susan stored it with her personal

7    effects.

8              MR. PAULSON:  Okay.  So even though Susan owns all

9    of the property that you once owned, you still listed all

10   this stuff on your bankruptcy schedules?

11             MR. HIGINBOTHAM:  Yes.

12             MR. PAULSON:  Why is that?

13             MR. HIGINBOTHAM:  It's for disclosure purposes to

14   show everything that one might want to count.

15             MR. PAULSON:  So by listing it on your bankruptcy

16   schedules, you're not saying that you have an ownership in

17   any of this property, is that what you're telling us today?

18             MR. HIGINBOTHAM:  I'm informing you as to what

19   property out there is an attachment to me.  Whether it's

20   ownership, I'll leave it up to the lawyers.

21             MR. PAULSON:  So is it your position that you don't

22   own any personal property?

23             MR. HIGINBOTHAM:  Yes.

24             MR. PAULSON:  Do you own any real estate?

25             MR. HIGINBOTHAM:  No.  No.  Excuse me, we are joint

1    tenants in (inaudible) in the Joliet real estate, but,

2    again, I've also given her everything, so I don't know --

3            MR. STERN:  He testified in the entirety on Joliet?

4            MR. HIGINBOTHAM:  Yes, in the entirety.

5            MR. STERN:  Joint tenants on the condo.

6            MR. PAULSON:  So let's talk about the co-op and the

7    Joliet property for a second.

8            So those are two pieces of real estate, correct?

9            MR. HIGINBOTHAM:  Yes.

10           MR. PAULSON:  Besides being in different places,

11   what's the difference between them?

12           So you have the property in Joliet?

13           MR. HIGINBOTHAM:  Yes.

14           MR. PAULSON:  Was that a family property?

15           MR. HIGINBOTHAM:  Yes.

16           MR. PAULSON:  Okay.  And what about the Chicago

17   condo or co-op?

18           MR. HIGINBOTHAM:  I bought that and -- we bought

19   that in 1995, I believe is the date.

20           MR. PAULSON:  When you bought it was it just in

21   your name?

22           MR. HIGINBOTHAM:  Originally it was in my name.

23           MR. PAULSON:  Okay.  And then at some point you

24   transferred some shares to Susan, correct?

25           MR. HIGINBOTHAM:  She -- yes, we talked about that.

Page 43

1          MR. PAULSON:  And then at some point after that you

2    then transferred all of your personal property to her?

3          MR. HIGINBOTHAM:  Yes.

4          MR. PAULSON:  Okay.  So why did you buy a place in

5    Chicago?

6          MR. HIGINBOTHAM:  Because I work downtown.  Because

7    we have friends in downtown.  And it's nice to be able to

8    stay in town sometimes and not be at the farm.

9          MR. PAULSON:  Okay.  How often would you say you

10   stayed at the condo or at the co-op?

11         MR. HIGINBOTHAM:  Most weeknights.

12         MR. PAULSON:  Okay.  How about on the weekends?

13         MR. HIGINBOTHAM:  Weekends, when I can I get down

14   to the farm.

15         MR. PAULSON:  When you can?

16         MR. HIGINBOTHAM:  Most weekends I drive there.

17         MR. PAULSON:  Okay.  Where does your wife stay most

18   of the time?

19         MR. HIGINBOTHAM:  Mostly downtown.

20         MR. PAULSON:  Okay.  Does she ever go back to the

21   farm?

22         MR. HIGINBOTHAM:  Yes.

23         MR. PAULSON:  The farm is the Joliet property,

24   correct?

25         MR. HIGINBOTHAM:  Yes.

1          MR. PAULSON:  Sir, on your bankruptcy schedules you

2    listed a number of insurance policies, life insurance

3    policies, do you recall that?

4          MR. HIGINBOTHAM:  Yes.

5          MR. PAULSON:  So I see on here there's 2, 3, 4, 5,

6    6 policies that appear to be whole life policies where Susan

7    Higinbotham is the beneficiary.

8          MR. HIGINBOTHAM:  Yes.

9          MR. PAULSON:  Is that correct?

10         MR. HIGINBOTHAM:  That's correct.

11         MR. PAULSON:  When did you purchase those policies?

12         MR. HIGINBOTHAM:  I think the first one was in the

13   '60's and they were various subsequent dates after that up

14   until -- if they have numbers on the policies you can

15   probably guess what the number would be -- the year.

16         MR. PAULSON:  Okay.  And when you say -- you listed

17   a surrender or refund value for each one of those policies?

18         MR. HIGINBOTHAM:  Yes.

19         MR. PAULSON:  And those all range -- they are in

20   the $6,000, $7,000, $8,000 range, correct?

21         Sir, I can show you the schedule.

22         MR. HIGINBOTHAM:  I'm sorry, it sounds correct,

23   but, yes.

24         MR. PAULSON:  Okay.  Have you borrowed against

25   those policies?

1          MR. HIGINBOTHAM:  I have in the past, but I'm not

2     borrowing against them now.

3          MR. PAULSON:  Is the entire value of the policy the

4     $7,980, what's listed here?

5          MR. STERN:  Cash surrender value?

6          MR. PAULSON:  That's what I meant.

7          MR. STERN:  Well, you said the entire value.  So,

8     if it's the entire cash surrender value then you may answer.

9          MR. PAULSON:  Is the entire value of the policy

10    what's listed here?

11         MR. STERN:  Entire cash surrender value?

12         MR. PAULSON:  That's not the question I'm asking.

13         MR. STERN:  Well we don't understand your question

14    then.

15         MR. PAULSON:  Well, maybe he could answer the

16    question.

17         MR. STERN:  I don't understand.

18         MR. PAULSON:  Well, that's fine.

19         MR. STERN:  They have a face value for the policy

20    and they have a cash surrender value.

21         MR. PAULSON:  That's enough.

22         Is there any outstanding loans on any of these

23    policies right now?

24         MR. STERN:  He says that there weren't.

25         MR. PAULSON:  He didn't say that actually.

1           MR. STERN:  Yes, he did.  He just said it a few

2    minutes ago.  That he had had loans on the policy previously

3    and that there are no loans at the present time.  That was

4    his testimony today.

5           MR. PAULSON:  Okay.

6           Sir, are there any loans on the policy right now.

7           MR. HIGINBOTHAM:  No.

8           MR. PAULSON:  Could you provide us copies of the

9    life insurance policies.

10          MR. HIGINBOTHAM:  I don't know.

11          MR. STERN:  We'll take that up.  You send me a

12   list, we'll provide what we think is appropriate.

13          FEMALE VOICE:  Mr. Wolf, do you want a copy of the

14   insurance policies, life insurance policies?

15          MR. WOLF:  I'll take maybe the first page, like a

16   certificate.

17          FEMALE VOICE:  And may we have a copy of that?

18          MR. STERN:  We'll provide a separate package when

19   we have everything that you want.

20          MR. PAULSON:  Sir, on the amended schedules you

21   listed a sanctions claim against my client, do you recall

22   that?

23          MR. HIGINBOTHAM:  Yes.

24          MR. PAULSON:  What was that for?

25          MR. HIGINBOTHAM:  That was in connection with a

1    motion she filed and withdrew in the Circuit Court and there

2    was a claim for the cost of dealing with the motion that was

3    withdrawn at the same time right after it was submitted.

4         MR. PAULSON:  Which motion was that?

5         MR. HIGINBOTHAM:  It was a motion concerning a

6    false Facebook page that she had created.

7         MR. PAULSON:  And have you filed any sanctions,

8    motions in the State Court related to that?

9         MR. HIGINBOTHAM:  I believe there's a 137.  I don't

10   recall.  I'm not a lawyer.

11        MR. PAULSON:  So there is something pending right

12   now?

13        MR. HIGINBOTHAM:  There is something pending, yes.

14        MR. PAULSON:  Is there a reason you didn't list it

15   on your original bankruptcy schedules?

16        MR. HIGINBOTHAM:  Oversight on the part of our

17   paperwork compiling.

18        MR. PAULSON:  Sir, before your bankruptcy schedules

19   were filed did you review them?

20        MR. HIGINBOTHAM:  Yes.

21        MR. PAULSON:  So you looked at all the answers to

22   all the questions, correct?

23        MR. HIGINBOTHAM:  Yes, I did.

24        MR. PAULSON:  Okay.  And, sir, you would have seen

25   this answer to number 33, claims against third parties and

Page 48

1   you would have noticed that it didn't have those claims for

2   sanctions, correct?

3            MR. HIGINBOTHAM:   That's imputing to me a level of

4   memory that may not be there.

5            MR. PAULSON:   Well, what --

6            MR. HIGINBOTHAM:   I might have noticed it if I had

7   thought of it I would of noticed it.   But if I had forgotten

8   about it at the time, I might not have.   I don't recall at

9   the moment whether -- I don't recall even thinking about it

10  at the time.

11           MR. PAULSON:   Are there other things --

12           MR. HIGINBOTHAM:   It goes back several years.

13           MR. PAULSON:   Are you aware of anything else that

14  you forgot about when you filled out the schedules?

15           MR. HIGINBOTHAM:   As I said today, I believe the

16  schedules are complete.

17           MR. PAULSON:   Do you often have memory problems as

18  to financial issues?

19           MR. HIGINBOTHAM:   I believe I have a kind of a very

20  normal 72 year old memory.

21           MR. PAULSON:   What do you mean by that?

22           MR. HIGINBOTHAM:   I mean by that there are times

23  when I forget things, but not unusually often.

24           MR. PAULSON:   Sir, you said you were 72 years old?

25           MR. HIGINBOTHAM:   Yes.

Page 49

1          MR. PAULSON:  Do you have any health issues right

2     now?

3          MR. HIGINBOTHAM:  I'm not sure how to respond to

4     that.  Do I have any pending important health problems that

5     I'm aware of, no.

6          MR. PAULSON:  Okay.  Do you have any heart issues?

7                    (CROSS TALKING)

8          MR. STERN:  Can we get back to the bankruptcy

9     estate.

10                   (LOW TALKING)

11         MR. PAULSON:  Sir, could you open your schedules to

12    the Schedule I, which is your statement of income.  And if

13    you can turn to the second page of that where it lists all

14    the deductions.

15         There is an insurance deduction here line 5E for

16    $6,319, do you see that?

17         MR. HIGINBOTHAM:  Yes.

18         MR. PAULSON:  What's that for?

19         MR. HIGINBOTHAM:  I believe it's for medical and

20    some life insurance.

21         MR. STERN:  Disability.

22         MR. HIGINBOTHAM:  And disability.  Disability.

23         Various forms of insurance.

24         MR. PAULSON:  Counsel, could you get us a breakdown

25    of what those insurance (inaudible), please.

Page 50

1          MR. STERN:  Put it on the (inaudible), we'll take

2     care of it.

3          MR. PAULSON:  Under 58 there is other deductions

4     for $4,000, can you tell me what that is?

5          MR. HIGINBOTHAM:  I'd have to look at that on one

6     of the forms.

7          MR. PAULSON:  Okay.  Can you get us a breakdown on

8     that, please.

9          MALE VOICE:  Can anyone hear Mr. Paulson?

10         MALE VOICE:  Yeah.

11         MALE VOICE:  Okay.

12         MR. PAULSON:  Also under line 5C, voluntary

13    contributions to retirement plans.

14         MR. HIGINBOTHAM:  Yes.

15         MR. PAULSON:  For $2,247.

16         MR. HIGINBOTHAM:  Uh-huh.

17         MR. PAULSON:  You're still contributing money to

18    your retirement plans?

19         MR. HIGINBOTHAM:  I was at the time that I was

20    filling out the schedule.  I think I will likely reduce that

21    going forward.

22         MR. PAULSON:  Okay.

23         Sir, if you can turn to Schedule J in the amended

24    schedules.

25         Line item 4C, you have $6,500 for home maintenance,

Page 51

1   repair and upkeep?

2           MR. HIGINBOTHAM:  Yes.

3           MR. PAULSON:  Do you have a breakdown of what that

4   amount was spent on?

5           MR. HIGINBOTHAM:  I don't know what I can provide.

6   It's an estimate of what I'm spending over the course of a

7   year divided by 12, but it varies seasonally and it involves

8   a number of different items.

9           MR. PAULSON:  How did you come up with the numbers

10  on this schedule?

11          MR. HIGINBOTHAM:  By estimating how much on a

12  monthly basis I'm spending on these items on average.

13          MR. PAULSON:  What did you base that estimate on?

14          MR. HIGINBOTHAM:  On my estimate of how much I'm

15  spending on average for those items.

16          MR. PAULSON:  Did you go back and look at bank

17  statements?

18          MR. HIGINBOTHAM:  I looked at bank statements.  I

19  looked at -- yes.

20          MR. PAULSON:  So if we review your bank statements

21  we'll see some support for that?

22          MR. HIGINBOTHAM:  You'll see some support, but you

23  wouldn't see all the support upon which I relied on.

24          MR. PAULSON:  Why?

25          MR. HIGINBOTHAM:  Because I would of had other

1   things in my memory and recollection that I was not a

2   support that was not needing a bank statement to tell me.

3   I'm not trying to be difficult.

4          MR. PAULSON:  You consulted Fox Rothschild as

5   lawyers; is that correct?

6          MR. HIGINBOTHAM:  Yes.

7          MR. PAULSON:  And you consulted them about filing a

8   bankruptcy case?

9          MR. HIGINBOTHAM:  Yes.

10         MR. PAULSON:  And that was in July of 2018?

11         MR. HIGINBOTHAM:  In the summer, yes.

12         MR. PAULSON:  Why did you consult them about filing

13  a bankruptcy case in July of 2018?

14         MR. HIGINBOTHAM:  When we were looking at options

15  that might be available to us depending upon things that

16  might happen in the Circuit Court case.

17         MR. PAULSON:  What kinds of things?

18         MR. HIGINBOTHAM:  Adverse financial rulings.

19         MR. PAULSON:  So back in July of 2018 you were

20  looking at bankruptcy as a way to deal with adverse rulings

21  from the State Court, correct?

22         MR. HIGINBOTHAM:  (Inaudible) what options were

23  available on various outcomes, things that might happen,

24  yes.

25         MR. PAULSON:  And you still owe Fox Rothschild

Page 53

1  money, correct?

2  　　　　MR. HIGINBOTHAM:  Yes.

3  　　　　MR. PAULSON:  So you spent the entire retainer with

4  them and then some; is that right?

5  　　　　MR. HIGINBOTHAM:  That's correct.

6  　　　　MR. PAULSON:  Why didn't you file a bankruptcy at

7  that point?

8  　　　　MR. HIGINBOTHAM:  I don't know the answer to that

9  question.  The decision was not made.

10  　　　　MR. PAULSON:  Is there a reason that Fox Rothschild

11  didn't file this bankruptcy case?

12  　　　　MR. HIGINBOTHAM:  I don't -- we selected another

13  attorney to do it for us.

14  　　　　　　　　(LOW TALKING)

15  　　　　MR. PAULSON:  I'm sorry, Mr. Stern, did you

16  suggest -- I didn't hear what you said there.

17  　　　　MR. STERN:  Me?

18  　　　　MR. PAULSON:  Yes.

19  　　　　MR. STERN:  I didn't say anything.

20  　　　　MR. PAULSON:  You did say something.

21  　　　　FEMALE VOICE:  You did.

22  　　　　MR. HIGINBOTHAM:  I don't recall him saying

23  anything.  I didn't hear anything.

24  　　　　MR. STERN:  If I said anything it was going to

25  start to be an objection to (inaudible).

Page 54

1           MR. PAULSON:  Sir, I have your 2017 tax return

2    here.  I just have a couple of questions about that.

3           On Form 1116, which is a few pages in, it

4    identifies some income that you received from Canada --

5    assets in Canada and Japan, do you see that?

6           MR. HIGINBOTHAM:  Yes.

7           MR. PAULSON:  Do you know what those assets were?

8           MR. HIGINBOTHAM:  Shares in companies.

9           MR. PAULSON:  Do you know which companies?

10          MR. HIGINBOTHAM:  Publically traded companies.

11          MR. PAULSON:  Do you know which companies those

12   are.

13          MR. HIGINBOTHAM:  I can guess, but I don't know if

14   you want me to guess.

15          MR.PAULSON:  What do you think they are?

16          MR. HIGINBOTHAM:  Among them Canada would be

17   Dominion Diamond.

18          MR. PAULSON:  Okay.

19          MR. HIGINBOTHAM:  And Japan would be Honda Motor

20   (inaudible).

21          MR. PAULSON:  All right.  If you could turn a few

22   pages forward to Schedule C.  There is a profit and loss

23   from business for Susan Higinbotham Apparel Design.  Under

24   line 26 on this form it says that there were wages of

25   $232,000, do you see that?

Page 55

1           MR. HIGINBOTHAM:  Yes.

2           MR. PAULSON:  Do you know who those wages were paid

3    to?

4           MR. HIGINBOTHAM:  They were paid to various

5    employees of hers.

6           MR. PAULSON:  Susan Higinbotham has employees?

7           MR. HIGINBOTHAM:  Yes.

8           MR. PAULSON:  Who are the -- how many employees?

9           MR. HIGINBOTHAM:  I don't recall at the moment.

10          MR. PAULSON:  Is it more than one?

11          MR. HIGINBOTHAM:  Yes.

12          MR. PAULSON:  Is it her?

13          MR. HIGINBOTHAM:  No.

14          MR. PAULSON:  So these were all paid to people

15   other than Susan Higinbotham?

16          MR. HIGINBOTHAM:  That's correct, yes.

17          MR. PAULSON:  I'm going to hand you 2016 tax

18   return.

19          MR. HIGINBOTHAM:  Do you want this back?

20          MR. PAULSON:  Sure.  Thank you.

21          So on here, on 2016 tax return, if you could turn

22   to page -- at the bottom is marked HNH000021.

23          Sir, have you seen this page before?

24          MR. HIGINBOTHAM:  Yes.

25          MR. PAULSON:  Can you explain to me what this page

Page 56

1    is?

2           MR. HIGINBOTHAM:  It's a page on which we -- which

3    we detail the amounts we claimed on the lead schedule 4686.

4           MR. PAULSON:  All right.  What is the purpose of

5    lead schedule?

6           MR. HIGINBOTHAM:  To make a claim for a theft.

7           MR. PAULSON:  What was --

8           MR. HIGINBOTHAM:  (Inaudible).

9           MR. PAULSON:  What was the theft in this case?

10          MR. HIGINBOTHAM:  As described here, theft of

11   personal property.

12          MR. PAULSON:  Who stole personal property?

13          MR. HIGINBOTHAM:  I think it's all detailed here.

14   Why don't -- you know, I'm not sure -- I can read this for

15   you if you want.  It was something that happened in Thailand

16   and it was losses that my wife incurred as a result of

17   actions undertaken in Thailand.

18          MR. PAULSON:  And in here you said that one of

19   supposed perpetrators was Gemma Allen, correct?

20          MR. HIGINBOTHAM:  I haven't read this for a while,

21   but it might say that, yes.

22          MR. PAULSON:  And Gemma Allen is one of the

23   attorneys representing Whipapor (phonetic) and

24   Takendum(phoentic), correct?

25          MR. HIGINBOTHAM:  That's correct, yes.

Page 57

1           MR. PAULSON:  And there was no loss, was there?

2           MR. HIGINBOTHAM:  That's a strange question.  Can

3      you interpret what you mean by that?

4           MR. PAULSON:  Was there a loss, sir?

5           MR. HIGINBOTHAM:  It says there was a loss.

6           MR. PAULSON:  It says on this -- the form there was

7      a loss, but there was no loss, was there?

8           MR. HIGINBOTHAM:  There was a loss.

9           MR. PAULSON:  In fact, didn't you include this in

10     here in order to try to lower your income for child support

11     purposes?

12          MR. HIGINBOTHAM:  No.

13          MR. PAULSON:  In fact, the information you provided

14     to IRS in this form is not true, is it?

15          MR. HIGINBOTHAM:  The information that I provided

16     on this form is true.

17          MR. PAULSON:  Every detail on here is true?

18          MR. HIGINBOTHAM:  To the best of my knowledge, yes.

19          MR. PAULSON:  To the best of your knowledge or it's

20     true?

21          MR. HIGINBOTHAM:  To the best of my knowledge.

22          MR. PAULSON:  Who provided the information in this

23     form?

24          MR. HIGINBOTHAM:  I did.

25          MR. PAULSON:  And at the time you believed that you

1    were scammed or tricked into having the three children that

2    are my clients, correct?

3          MS. O'BRIEN:  You know, I'm going to object.  I

4    mean how is this going back to the bankruptcy schedule?  I

5    mean if they want to conduct a 2004 exam.

6          MR. STERN:  Let me do this.  Let me suggest this.

7    We're going to try to accommodate his personal request.  If

8    we have to continue the meeting, that's fine, but I'll

9    apologize for interrupting, but are there any other

10   creditors here who would like to ask a couple of questions.

11         MALE VOICE:  I would like to ask a couple of

12   questions.

13         MR. STERN:  I've got two people promising a couple.

14         MALE VOICE:  Ladies first.

15         MALE VOICE:  Please state your name, ma'am.

16         MR. STERN:  Go right ahead, ma'am.

17         MS. ALLEN:  Gemma Allen, attorney for petitioner in

18   the Circuit Court case.

19         What is the interest rate on the note you owe to

20   Susan Higinbotham?

21         MR. HIGINBOTHAM:  I'd have to look to verify.  It

22   might be 15 percent, but I'm not certain.

23               (CROSS TALKING)

24         MR. Higinbotham:  It's whatever the note says.  You

25   can look at the note just as easily as I can.  Whatever it

1    says.

2            MS. ALLEN:  I'm asking you, sir.

3            MR. HIGINBOTHAM:  I know you are and I'm telling

4    you that the best way to find that out is to look at the

5    note and you'll find it out.  Whatever it says I would be

6    happy to attest to.

7            MS. ALLEN:  And do you recall that it was 15

8    percent, sir?

9            MR. HIGINBOTHAM:  I think that's right, but I'm not

10   certain.  As I said --

11           MS. ALLEN:  And do you recall.

12                (CROSS TALKING)

13           MALE VOICE:  Let him finish the question -- answer.

14           MS. ALLEN:  Pardon.

15           MALE VOICE:  Can you let him finish his answer

16   before you talk over him.

17           MR. HIGINBOTHAM:  Thank you.

18           MALE VOICE:  All right.  We're going to -- let's

19   try to slow things down.

20           Sir, do you recall the interest rate or not?

21           MALE VOICE:  He said that he thought it was 15

22   percent, but he'S not certain.

23           MR. HIGINBOTHAM:  I think it's 15 percent.  It's

24   right on the face of the note.

25           MALE VOICE:  All right.

Page 60

1          MR. HIGINBOTHAM:  Anyone who wants to can look for

2     it.

3          MALE VOICE:  All right.

4          MS. ALLEN:  And you set that interest rate; is that

5     correct?

6          MR. HIGINBOTHAM:  Yes.

7          MS. ALLEN:  And what is Higinbotham Capital?

8          MR. HIGINBOTHAM:  Higinbotham Capital is a legal

9     entity of my wife's, LLC, I believe.

10         MS. ALLEN:  And what interest, if any, do you have

11    in that, sir?

12         MR. HIGINBOTHAM:  None.

13         MS. ALLEN:  But you have actually transferred money

14    to Higinbotham Capital; have you not?

15         MR. HIGINBOTHAM:  I believe I have, yes.

16         MS. ALLEN:  Why?

17         MR. HIGINBOTHAM:  Because -- on behalf of Susan's

18    request for money that she would want to put into

19    Higinbotham Capital.

20         MS. ALLEN:  And over what period of time did you do

21    that, sir?

22         MR. HIGINBOTHAM:  There's a long schedule that,

23    again, I would refer to, which is much more accurate than

24    anything that I can guess at here in terms of what I can

25    recall today.

1          FEMALE VOICE:  Are we going to get that schedule?

2          MR. HIGINBOTHAM:  You'll have that when she has it.

3          FEMALE VOICE:  This document was prepared in the

4     support case, so all of these attorneys that are asking

5     these questions have all of this information.

6          MR. HIGINBOTHAM:  Ms. Allen has some wonderful

7     blown up versions.

8          FEMALE VOICE:  Okay.  I think US Trustees office --

9          FEMALE VOICE:  I understand.  I'll give it to you.

10          FEMALE VOICE:  I'm just asking.

11          FEMALE VOICE:  I understand.

12               (LOW TALKING)

13          MR. STERN:  Ma'am, any more questions?

14          MS. ALLEN:  And you have no interest in Higinbotham

15     Capital, other than the money you transferred into it; is

16     that correct?

17          MR. HIGINBOTHAM:  I don't have an interest from the

18     money I transferred into it either, no.

19          MS. ALLEN:  Did you ever have an interest in

20     Higinbotham Capital?

21          MR. HIGINBOTHAM:  I don't think so.  I don't

22     recall.

23          MS. ALLEN:  I have nothing further.

24          MALE VOICE:  If I may, sir.

25          MR. STERN:  Yes, please.

1      MALE VOICE:  My name is Howard (inaudible).  I'm

2  the court appointed lawyer for the three minor children.

3      Mr. Higinbotham, is it a matter of fact, sir, that

4  you are the father of triplets?

5      MR. STERN:  We're not going -- I'm going to

6  instruct him not to answer that.  You've got this

7  information.  This is -- there's a paternity determination.

8  So if it's not in the schedules, he's not answering it.

9  That question is not going to be answered.

10                 (CROSS TALKING)

11     MALE VOICE:  If I may just, this is relevant to the

12 next question I'm going to ask, if I may, and since he's not

13 going to answer, that will be up to him, obviously, and up

14 to you, I'd like to follow it up with another question.

15     MR. STERN:  Please do.  I'm not in a position to

16 compel him to answer, that would be Judge Hunt that would do

17 that.

18     MALE VOICE:  Very good.  Sir --

19     MALE VOICE:  Before we go there.  Are you going to

20 take your attorney's instruction not to answer the question?

21     MR. HIGINBOTHAM:  I understand it's not a question

22 that is proper in this proceeding, so the answer is yes.

23 It's not relevant for this meeting.  You want to show the

24 relevance, that might help.

25     MALE VOICE:  Sir, isn't it a fact that your wife,

1  Susan, find out about the triplets on Labor Day, September

2  of 2009.

3          MR. HIGINBOTHAM:  September 6, 2009, if that's

4  Labor Day.

5          MALE VOICE:  And let me ask you, sir, on September

6  6, 2009 what, if any, property or assets did you own were

7  held in tenancy by the entirety?

8          MR. HIGINBOTHAM:  I don't recall.

9          MALE VOICE:  Sir, isn't it a fact that the tenancy

10  by the entirety on all of the assets that you came -- that

11  you claim to hold in that manner were done after your wife

12  found out on September 6, 2009?

13          MR. HIGINBOTHAM:  The record will speak for itself.

14          MALE VOICE:  No, sir.  I'm asking you the question.

15  Isn't it a fact that you established all of these tenancy by

16  the entirety after September 6, 2009 when your wife found

17  out about the triplets?

18          MR. HIGINBOTHAM:  That's plausible, but I would

19  need to check through the dates of these various documents

20  we've been talking about.  It's a plausible hypothesis.

21          MALE VOICE:  Matter of fact, it's correct; isn't

22  it, Mr. Higinbotham?

23          MR. HIGINBOTHAM:  I don't know for certain what's

24  correct.  I certainly gave my wife many things before

25  September 2000 --

Page 64

1          MALE VOICE:  Ms. Higinbotham, I'm not asking you

2     what you gave your wife "many things".  I'm talking about

3     those entities or accounts that you established by tenancy

4     by the entirety, were any of them in existence prior to

5     September 6, 2009?

6          MR. HIGINBOTHAM:  What accounts are you talking

7     about specifically?

8          MALE VOICE:  Any one, sir, that you hold currently

9     with tenancy by the entirety.

10         MR. HIGINBOTHAM:  Why don't you define your

11    question.

12         MALE VOICE:  Sir, you don't know what tenancy by

13    the entirety is?

14         MR. HIGINBOTHAM:  I would use the term today and I

15    can think of specific accounts --

16         MALE VOICE:  Sir.

17         MR. HIGINBOTHAM:  -- and we can go through one by

18    one if you'd like and that might be a better way to do it.

19         MALE VOICE:  Sir, you and I walked through this

20    many times, sir.  Now, sir, please state what accounts you

21    had prior to September 6, 2009 that you held by tenancy in

22    the entirety with Suzanne.

23         MR. HIGINBOTHAM:  Let's just go through the

24    accounts that I can remember and that's all --

25                    (CROSS TALKING)

Page 65

1          MALE VOICE:  How about the order of trust, did you

2     hold that by tenancy in entirety with Suzanne prior to

3     September 6, 2009?

4          MR. HIGINBOTHAM:  I don't recall what the date of

5     making that joint account was.

6          MALE VOICE:  Well, sir, tell me what you -- well,

7     sir, prior to September 6, 2009 that account was in your

8     name solely; was it not, sir?

9          MR. HIGINBOTHAM:  It may have been, yes.

10          MALE VOICE:  Sir, is it a fact that all of the

11    accounts that you had, investment accounts were all in your

12    name solely; isn't that correct, sir?

13          MR. HIGINBOTHAM:  I would have to check.  I'm not

14    trying to be evasive here.  I just don't remember the

15    certain accounts.

16          MALE VOICE:  Well, sir, tell me prior to September

17    6, 2009, tell me any account that you held jointly with

18    Susan?

19          MR. HIGINBOTHAM:  At the moment I can't think of

20    anything, but that's not --

21          MALE VOICE:  Because you didn't of any, did you,

22    sir?

23          MR. HIGINBOTHAM:  Everything is out here in the

24    open, if you -- you can draw your own conclusions from the

25    facts.  We don't need to have me do the analysis for you.

1          MALE VOICE:  Well, sir, I'm asking you questions

2     and you're not giving me answers.

3          MS. O'BRIEN:  Well, at some point --

4               (CROSS TALKING)

5          MS. O'BRIEN:  -- if there's an issue with regards

6     to the tenancy by the entirety, lets let the court decide.

7               (CROSS TALKING)

8          MALE VOICE:  I apologize.

9          Let me ask you this, sir, you've already testified

10    that the Joliet property was held in your name only prior to

11    September 9, 2009 based on the deed that we have here that's

12    November 29th, correct?

13         MR. HIGINBOTHAM:  That's correct.

14         MALE VOICE:  Isn't it a fact also, sir, that the

15    co-op was held in your name only from the date of purchase?

16         MR. HIGINBOTHAM:  I think that's correct, yes.

17         MALE VOICE:  And you only put Susan's name on the

18    co-op subsequent to September 9, 2009; isn't that correct,

19    sir?

20         MALE VOICE:  September 6th.

21         MALE VOICE:  I'm sorry, 2009; isn't that correct,

22    sir?

23         MR. HIGINBOTHAM:  That's correct, yes.

24         MALE VOICE:  Isn't it a fact, sir, that all these

25    notes that you claim to owe Susan any money whatsoever are

1  all subsequent to September 6, 2009; isn't that correct,

2  sir?

3          MR. HIGINBOTHAM:  I'd have to check, but I believe

4  that's correct.

5          MALE VOICE:  Right, sir.  Isn't it a fact that all

6  these notes which you claim to owe Susan money, Susan is

7  never giving you a penny in money on any of these notes that

8  you've established?

9          MR. HIGINBOTHAM:  The notes are not in

10 consideration --

11         MALE VOICE:  For anything.

12         MR. HIGINBOTHAM: -- for money.

13         MALE VOICE:  For money?

14         MR. HIGINBOTHAM:  Correct.

15         MALE VOICE:  And they're only in consideration

16 because she found out about the triplets?

17         MR. HIGINBOTHAM:  No, I wouldn't say that.

18         MALE VOICE:  I see.

19         And you understand, sir, that if you go bankrupt

20 here, you're attempting avoid paying the Circuit Court

21 order?

22         MR. STERN:  I'll object to that.  That is not a

23 correct characterization.

24         MALE VOICE:  I'm asking him a question.

25         MR. STERN:  Well, it's not -- he's not going

Page 68

1    bankrupt, so that's not a proper --

2          MALE VOICE:  I'll withdraw the question, Mr. Stern.

3          MR. STERN:  Thank you.

4          MALE VOICE:  By filing Chapter 11, sir, are you not

5    attempting to delay any payments you should make to your

6    triplets that you fathered with --

7          MR. HIGINBOTHAM:  I'm attempting to sort out

8    between the creditors conflicting claims.

9          MALE VOICE:  One other question, sir, if there's no

10   claim of $12 million dollars for Susan that you allege in

11   the schedules, $12 or $13 million, you're able to pay all

12   your creditors just fine; aren't you, sir?

13         MR. HIGINBOTHAM:  The answer is, no, I'm not.

14         MALE VOICE:  You're not.  I have no further

15   questions.

16         MR. STERN:  Okay.  Does anybody else have anything

17   they'd like to interject here.

18         FEMALE VOICE:  I have a request.

19         MR. STERN:  Sure.

20         FEMALE VOICE:  Is it possible that counsel for the

21   debtor would agree to enter into an agreed order to extend

22   day two object exemptions.  You've got an awful lot here.

23         MR. STERN:  We'll discuss it later.  I'll see your

24   request.

25         FEMALE VOICE:  It would benefit the US Trustees

Page 69

1    office.

2            MR. STERN:  I said I'll discuss it with you.

3            MALE VOICE:  I think it's a reasonable request,

4    but.

5            FEMALE VOICE:  Can we discuss it on the record?

6            MR. STERN:  No.

7            MALE VOICE:  We can always file a motion if need

8    be.

9            MR. STERN:  That's right.

10           FEMALE VOICE:  I was just trying to save some time.

11           MALE VOICE:  I appreciate it.  I appreciate it.

12           I am willing to keep going here myself, but it's --

13           MR. STERN:  Does anybody else have anymore

14    questions.

15           MALE VOICE:  But it's 3:00 -- I cut Mr. Paulson

16    off.

17           MR. STERN:  Jeff, do you have more questions?

18           MR. PAULSON:  Just one minor question.

19           MR. STERN:  Sure.

20           MALE VOICE:  I was trying to deal with it.

21           MR. PAULSON:  Sir, you filed for bankruptcy on

22    November 5th; is that correct?

23           MR. HIGINBOTHAM:  Yes.

24           MR. PAULSON:  Have you been spending money on

25    anything since then?

Page 70

1           MR. HIGINBOTHAM:  Yes.

2           MR. PAULSON:  Like going out to eat or your

3    ordinary expenses?

4           MR. HIGINBOTHAM:  Ordinary expenses, yes.

5           MR. PAULSON:  Okay.  Where are you getting the

6    money to pay to for those items?

7           MR. HIGINBOTHAM:  Well, some from salary.

8           MR. PAULSON:  Okay.

9           MR. HIGNBOTHAM:  Some from my wife is paying for

10   things.

11          MR. PAULSON:  Some is your wife is paying for

12   things?

13          MR. HIGINBOTHAM:  Yes, some my wife is paying for.

14          MR. PAULSON:  But at least some of the money that

15   you're spending -- that you've spent in the past month has

16   come from your salary?

17          MR. HIGINBOTHAM:  Oh, yes.

18          MR. PAULSON:  Okay.  All right.  Thank you.  That's

19   it.

20                  (LOW TALKING)

21          MALE VOICE:  All right.  I'll tell you what,

22   there's a significant question that came up.  It's got to be

23   resolved.  This idea of Mr. Higinbotham having transferred

24   all of his property away.  My thinking is that his belief is

25   that he doesn't own anything.

1          MR. STERN:  It's possible, but I think the legal

2     documents show differently.  That's why the schedules

3     reflect what they do.

4          MALE VOICE:  So, sir, are these -- do you own the

5     property listed in these schedules?

6          MR. HIGINBOTHAM:  I'm on the -- I'm titled as the

7     owner, yes.

8          FEMALE VOICE:  What?

9          MR. HIGINBOTHAM:  I'm on the schedules as the

10    owner.

11         FEMALE VOICE:  He said I'm on title.

12         MALE VOICE:  And do you dispute any ownership of

13    any of the property listed in your schedules, that you don't

14    own it, is that what you're telling us?

15         MR. HIGINBOTHAM:  I think there's conflicting

16    claims.  I've given everything to my wife, so at the same

17    time I'm on the title to the property.  So at that point I

18    don't have clear legal picture of how to answer your

19    question.

20         MS. O'BRIEN:  I mean, ultimately if Susan's

21    attorney thinks that she has an ownership interest in some

22    of these assets, they're going to have to come forward and

23    make that claim and convince Judge Hunt of that.

24         MALE VOICE:  All right.  Now the parties need to be

25    able to rely on the schedules that were filed.

Page 72

1          MR. STERN:  I think you can rely upon them.

2

3               (CROSS TALKING)

4          MR. STERN:  How could you not rely upon them?

5          MALE VOICE:  His testimony kind of calls

6    reliability into question.

7          MR. STERN:  Well, it does, but if, for example, if

8    you take the real property in Joliet, the deed shows he's

9    entitled.  She might think she owns the claim.  We've noted

10   that.

11         MALE VOICE:  All right.  We're going to rely on the

12   schedules.

13         MR. STERN:  Yes.

14         MS. O'BRIEN:  Yes.

15         MALE VOICE:  Until proven differently.

16         MR. STERN:  Absolutely.

17         MS. O'BRIEN:  Yes.

18         MALE VOICE:  We're going to disregard --

19         MS. O'BRIEN:  Yes.

20         MALE VOICE:  Mr. Higinbotham's --

21         MS. O'BRIEN:  Belief.

22         MALE VOICE:  Belief.

23         MR. STERN:  You're going to disregard

24   Mrs. Higinbotham's claim until it's adjudicated in her

25   favor.

1          MALE VOICE:  I'm going to disregard what I'm going

2     to disregard.

3          MR. STERN:  No problem, that's good with me.

4          MALE VOICE:  Any other questions?

5          MALE VOICE:  Just one question from her inquiry, if

6     I may?

7          MALE VOICE:   Sure.

8          MALE VOICE:  You saw a schedules on personal

9     property, is that a schedule on personal property for both

10    pieces of real estate, the Joliet -- the Joliet Township

11    real estate and the Chicago co-op and all the schedules to

12    be attached listing all the personal property, I assume

13    that's is what we're requesting from the debtor.  When you

14    said the insurance I just wasn't clear --

15         MALE VOICE:  Oh, sure.

16         MALE VOICE:  -- would be all the schedules, every

17    schedule attached to every policy.  And I would also ask, if

18    I may, that that go back three years, if that is available.

19         MS. O'BRIEN:  This is the thing --

20         MALE VOICE:  Because I think it would be

21    indicative --

22         MS. O'BRIEN:  I'm sorry to interrupt.  The only

23    insurance policy that has an actual detailed schedule is the

24    insurance policy that I received through the -- that they

25    have in the discovery, which is the itemization of the line

1   by line itemization of the paintings, that are in the

2   Lakeshore Drive property.  There's no other detailed

3   itemization in any insurance policy.

4         MALE VOICE:  There's no other detailed itemization

5   that we have.  I would ask that if there is any schedule

6   that has detailed itemization, that it be provided to the

7   court to determine, take a look at it, I would like to see

8   it from both properties.

9         MALE VOICE:  What I would request is complete

10  copies of the insurance for both --

11        MS. O'BRIEN:  I will.

12        MALE VOICE: -- when I say "complete", that would

13  include any riders.

14        MS. O'BRIEN:  Will do.  Will do.

15        MALE VOICE:  Okay.  And we'll take a look at it

16  from there.

17        MALE VOICE:   Thank you.

18        MALE VOICE:  You're welcome.  If you want those,

19  step number one would be to talk to counsel.

20        MALE VOICE:  Okay.

21        MALE VOICE:  They generally don't give out like

22  personal information, that kind of thing, so.

23        MS. O'BRIEN:  I have no problem with giving

24  information because it's the same information that they

25  already have.  So I'm happy to give the current updated

Page 75

1   versions.

2           MALE VOICE:  We appreciate your cooperation.

3           MS. O'BRIEN:  Not a problem.

4           MR. STERN:  Last call.

5           FEMALE VOICE:  I have a quick question.

6           Do you have an antique collection anywhere?

7           MR. HIGINBOTHAM:  I wouldn't call it an antique

8   collection.  I have some antique things.

9           FEMALE VOICE:  What would you call it?

10          MR. HIGINBOTHAM:  What would I call what?  Again,

11  I'm --

12          MALE VOICE:  You call it what it's called in the

13  schedules, collectibles.

14          FEMALE VOICE:  Is it listed in here?

15          MR. STERN:  Yes.

16          FEMALE VOICE:  And valued in here?

17          MR. STERN:  Yes.

18          MALE VOICE:  Okay.

19          FEMALE VOICE:  I just have a couple of things.

20          With regards to Susan's business, it says an

21  apparel design, can you be more specific --

22          MS. O'BRIEN:  I'm going to object.  It's not

23  relevant to the debtor if it's Susan's business.  He's

24  already testified that he has no interest in that business.

25  So this really isn't relevant to his individual bankruptcy.

1          FEMALE VOICE:  He talked about the other business,

2     not the apparel design.

3          MR. STERN:  No, you're correct, but a simple

4     question or no.

5          MR. HIGINBOTHAM:  What's the yes or no question?

6          FEMALE VOICE:  Describe the nature of that nature.

7          MR. HIGINBOTHAM:  Is that a yes or no question?

8                    (LAUGHTER)

9          FEMALE VOICE:  Describe the nature of it.

10         MR. HIGINBOTHAM:  That's a yes or no question?

11         MALE VOICE:  Please just answer the question, sir.

12         MR. HIGINBOTHAM, sure I'm happy to.  It's a

13    collection -- she has various design forms and examples of

14    things and she wants to build on that, build up an apparel

15    design business.

16         FEMALE VOICE:  And has no income?

17         MR. HIGINBOTHAM:  Today has no income, yes.

18         FEMALE VOICE:  And no income last year; is that

19    correct?

20         MR. HIGINBOTHAM:  That's correct.

21         FEMALE VOICE:  And you overpaid your taxes, is that

22    correct, sir, for 2017?

23         MR. HIGINBOTHAM:  Yes.

24         FEMALE VOICE:  And are you still giving $2,000 a

25    month to charity, as set forth on your schedule?

1           MR. HIGINBOTHAM:  Probably not.

2           FEMALE VOICE:  That's got to be the bankruptcy

3    schedule.

4           MR. HIGINBOTHAM:  That will be reduced.

5           FEMALE VOICE:  I'm sorry I did not hear you.

6           MR. HIGINBOTHAM:  That will be reduced.

7           FEMALE VOICE:  Nothing further.  Thank you, sir.

8           MALE VOICE:  You're welcome.  Okay.

9           I'm going to conclude this meeting.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2

3                  -  -  -

4

5

6

7

8

9

10        I, Stephanie Ciarcia, do hereby certify that I was

11   authorized to and did listen to and transcribe the forgoing

12   recorded proceedings and that the transcript is a true

13   record to the best of my ability.

14

15

16        Dated this 18th of December, 2018.

17

18

19

20        _____

21             Stephanie Ciarcia

22

23

24

25

# Exhibit B

| Fill in this information to identify your case: | | | |
|---|---|---|---|
| Debtor 1 | Harlow N Higinbotham | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF ILLINOIS | | |
| Case number | 18-31185 | | |
| (if known) | | | |

☐ Check if this is an amended filing

## Official Form 106C

# Schedule C: The Property You Claim as Exempt

4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Using the property you listed on *Schedule A/B: Property* (Official Form 106A/B) as your source, list the property that you claim as exempt. If more space is needed, fill out and attach to this page as many copies of *Part 2: Additional Page* as necessary. On the top of any additional pages, write your name and case number (if known).

For each item of property you claim as exempt, you must specify the amount of the exemption you claim. One way of doing so is to state a specific dollar amount as exempt. Alternatively, you may claim the full fair market value of the property being exempted up to the amount of any applicable statutory limit. Some exemptions—such as those for health aids, rights to receive certain benefits, and tax-exempt retirement funds—may be unlimited in dollar amount. However, if you claim an exemption of 100% of fair market value under a law that limits the exemption to a particular dollar amount and the value of the property is determined to exceed that amount, your exemption would be limited to the applicable statutory amount.

### Part 1:    Identify the Property You Claim as Exempt

1. **Which set of exemptions are you claiming?** *Check one only, even if your spouse is filing with you.*

    ■ You are claiming state and federal nonbankruptcy exemptions.   11 U.S.C. § 522(b)(3)

    ☐ You are claiming federal exemptions.   11 U.S.C. § 522(b)(2)

2. **For any property you list on** *Schedule A/B* **that you claim as exempt, fill in the information below.**

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own  Copy the value from *Schedule A/B* | Amount of the exemption you claim  *Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| RD No. 2 2002 East Cass Street Joliet, IL 60432  Will County  Subject to claims of Susan Higinbotham  Line from *Schedule A/B*: 1.1 | $1,987,350.00 | ■ $15,000.00  ☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-901 |
| RD No. 2 2002 East Cass Street Joliet, IL 60432  Will County  Subject to claims of Susan Higinbotham  Line from *Schedule A/B*: 1.1 | $1,987,350.00 | ■ 100%  ☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-112 |
| 2002 Chevrolet Silverado  Line from *Schedule A/B*: 3.2 | $4,000.00 | ■ $2,400.00  ☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(c) |
| Necessary Wearing Apparel  Line from *Schedule A/B*: 11.1 | $5,000.00 | ■ $5,000.00  ☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(a) |
| Checking Account ending 1987:  Northern Trust - Current value reflects Debtor's 50% ownership interest  Line from *Schedule A/B*: 17.1 | $36,510.00 | ■ $4,000.00  ☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(b) |

Official Form 106C                    Schedule C: The Property You Claim as Exempt                                    page 1 of 3

Debtor 1    Harlow N Higinbotham                                                Case number (if known)    18-31185

| Brief description of the property and line on Schedule A/B that lists this property | Current value of the portion you own<br><br>Copy the value from Schedule A/B | Amount of the exemption you claim<br><br>Check only one box for each exemption. | Specific laws that allow exemption |
|---|---|---|---|
| Brokerage Account ending 6357: Northern Trust Securities, Inc. (value as of October 31, 2018)<br>Line from Schedule A/B: 17.2 | $10,691,837.41 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | NJ Rev Stat Section 46:3-17.2 - Tenancy by Entirety |
| 401(k): Marsh & McLennan Companies (value as of October 31, 2018)<br>Line from Schedule A/B: 21.1 | $816,825.17 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1006 |
| Rollover IRA: Fidelity Brokerage Services LLC (value as of October 31, 2018)<br>Line from Schedule A/B: 21.2 | $1,811,231.85 | ■ $1,807,236.63<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1006 |
| Roth Retirement Account: Fidelity Brokerage Services LLC(value as of October 31, 2018)<br>Line from Schedule A/B: 21.3 | $37,699.08 | ■ $37,699.08<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1006 |
| Retirement Annuity Through Employer (Prudential)<br>Line from Schedule A/B: 23.1 | Unknown | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1006 |
| AXA Equitable Life Insurance Company (policy ending 329)<br>Beneficiary: Susan Higinbotham<br>Line from Schedule A/B: 31.2 | $7,980.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(f) |
| AXA Equitable Life Insurance Company (policy ending 329)<br>Beneficiary: Susan Higinbotham<br>Line from Schedule A/B: 31.2 | $7,980.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(h)(3) |
| AXA Equitable Life Insurance Company, whole life policy ending 664<br>Beneficiary: Susan Higinbotham<br>Line from Schedule A/B: 31.3 | $6,790.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(f) |
| AXA Equitable Life Insurance Company, whole life policy ending 664<br>Beneficiary: Susan Higinbotham<br>Line from Schedule A/B: 31.3 | $6,790.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(h)(3) |
| AXA Equitable Life Insurance Company, Whole Life Policy ending 136<br>Beneficiary: Susan Higinbotham<br>Line from Schedule A/B: 31.4 | $6,500.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(f) |
| AXA Equitable Life Insurance Company, Whole Life Policy ending 136<br>Beneficiary: Susan Higinbotham<br>Line from Schedule A/B: 31.4 | $6,500.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(h)(3) |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                                                    Best Case Bankruptcy

| Debtor 1 | Harlow N Higinbotham | | Case number (if known) | 18-31185 |

| Brief description of the property and line on *Schedule A/B* that lists this property | Current value of the portion you own<br><br>Copy the value from *Schedule A/B* | Amount of the exemption you claim<br><br>*Check only one box for each exemption.* | Specific laws that allow exemption |
|---|---|---|---|
| AXA Equitable Life Insurance Company, While Life Policy ending 992<br>Beneficiary: Susan Higinbotham<br>Line from *Schedule A/B*: 31.5 | $6,592.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(f) |
| AXA Equitable Life Insurance Company, While Life Policy ending 992<br>Beneficiary: Susan Higinbotham<br>Line from *Schedule A/B*: 31.5 | $6,592.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(h)(3) |
| AXA Equitable Life Insurance Company, Whole Life Policy ending 821<br>Beneficiary: Susan Higinbotham<br>Line from *Schedule A/B*: 31.6 | $6,425.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(f) |
| AXA Equitable Life Insurance Company, Whole Life Policy ending 821<br>Beneficiary: Susan Higinbotham<br>Line from *Schedule A/B*: 31.6 | $6,425.00 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(h)(3) |
| AXA Equitable Life Insurance Company, Whole Life Policy ending 923<br>Beneficiary: Susan Higinbotham<br>Line from *Schedule A/B*: 31.7 | $8,657.84 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(f) |
| AXA Equitable Life Insurance Company, Whole Life Policy ending 923<br>Beneficiary: Susan Higinbotham<br>Line from *Schedule A/B*: 31.7 | $8,657.84 | ■ 100%<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(h)(3) |
| Farm Tools and Equipment (subject to claims of Susan Higinbotham). Current value reflects Debtor's 50% ownership interest<br>Line from *Schedule A/B*: 49.1 | $2,500.00 | ■ $1,500.00<br>☐ 100% of fair market value, up to any applicable statutory limit | 735 ILCS 5/12-1001(d) |

3. **Are you claiming a homestead exemption of more than $160,375?**
   (Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.)

   ☐ No

   ■ Yes. Did you acquire the property covered by the exemption within 1,215 days before you filed this case?

       ■ No

       ☐ Yes

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com

Fill in this information to identify your case:

| | | | |
|---|---|---|---|
| Debtor 1 | Harlow N Higinbotham | | |
| | First Name | Middle Name | Last Name |
| Debtor 2 | | | |
| (Spouse if, filing) | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF ILLINOIS

Case number   18-31185
(if known)

■ Check if this is an
amended filing

Official Form 106Dec
# Declaration About an Individual Debtor's Schedules

12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Sign Below

Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?

■ No

☐ Yes. Name of person _____    *Attach Bankruptcy Petition Preparer's Notice,
Declaration, and Signature (Official Form 119)*

Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.

X _Harlow N. Higinbotham_                    X _____
Harlow N Higinbotham                         Signature of Debtor 2
Signature of Debtor 1

Date   January 9, 2019                        Date _____

Official Form 106Dec          Declaration About an Individual Debtor's Schedules