## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HARLOW N. HIGINBOTHAM, | ) | Case No. 18 B 31185 |
| | ) | |
| Debtor. | ) | Hon. LaShonda A. Hunt |

## **<u>REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS</u>**

Movants'[1] Motion to Dismiss this Chapter 11 Case (the "***MTD***") implores the Court to preserve the integrity of the bankruptcy system by keeping its doors closed to a debtor who does not need bankruptcy protection and who filed for relief solely to continue his decade-long crusade to deny his 3 sons child support payments. Bankruptcy relief should be used only as a shield and not a weapon, and yet allowing this case to proceed will only further animate the Debtor's abusive conduct towards his 3 sons.

And although the Debtor's response to the MTD tries to add a veneer of legitimacy to an otherwise distressing picture of lies, misrepresentations and vexatious litigation,[2] the Court should see through this façade, as did Judge Bernstein when she concluded that the Debtor would stop at nothing to deny his 3 sons the child support to which the law entitled them.[3] The choice is thus easy: this chapter 11 case should be dismissed.

---

[1] Wipaporn Teekhungam ("Teekhungam") and the Parties' Minor Children shall be collectively referred to as the "Movants." Judge Bernstein reminded the parties that Wipaporn is not seeking support from the Debtor.

[2] Judge Bernstein found that "Harlow is extraordinarily, if not vexatiously, litigious." *See* Ex. 1 at 13.

[3] Judge Bernstein specifically found that: "When asked if there was a limit to the amount of funds that he would spend litigating this case in order to preclude having to support his sons, he answered in the negative. In the last day of testimony, he indicated that he would continue to litigate this issue until 'he receives justice' which the court took to mean his not being obligated to support his sons." *Id.* at 13.

## I.    INTRODUCTION

The Debtor's Responsive Brief (the "***Response***") proves this is a two-party dispute that belongs in the domestic relations division of the Circuit Court of Cook County. With rare candor, the Response concedes this case was filed solely because the Debtor wants to stop or at least delay interminably the day of reckoning with his children – i.e., when he has to pay the support awarded to them by Judge Bernstein. He concedes he invoked this Court's jurisdiction solely to maintain the status quo on his terms while he challenges the State trial court judgment (the "***Judgment***", a copy of which is appended as Exhibit 1) in an appellate tribunal, even though Illinois law expressly bars a litigant from staying enforcement of a support award pending appeal.[4] In other words, the Debtor concedes he filed this case as a litigation tactic to circumvent the Judgment that awarded his 3 sons the child support their mother spent a decade to obtain and that he has the ability to pay, but chooses not to pay.

Admittedly, a debtor does not automatically get kicked out of bankruptcy court when they file to invoke the automatic stay, or when they are solvent, or when the action is a two-party dispute, or when the action is driven by domestic relations issues, or when the debtor has a history of fabricating obligations and transfers to render themselves judgment proof, although such cases are viewed with skepticism and are allowed to proceed only upon a heightened showing of some pressing need for bankruptcy relief. However, the Debtor has pointed to no precedent that allows an individual to remain in bankruptcy when all of these factors are present – i.e., the case is a two-party dispute, the debtor filed solely to obtain a stay pending appeal of a child-support judgment that cannot be stayed under non-bankruptcy law, a State court entered a judgment that he can afford to pay without any difficulty and a court has determined that he manufactured transfers and obligations to render himself penurious. Viewed as a whole, this case makes a mockery of title 11 and should be dismissed as patently abusive of the process.

---

[4] On March 5, 2019, the State Court entered what is known as a 304(a) order that makes the Judgment final and thus appealable. The Judgment already has been appealed.

The Response also largely ignores the facts that support a finding of bad faith and, as noted above, tries to put fresh paint on an otherwise troubling fact pattern. The Response asserts "there are no facts to support a finding that the Debtor's Chapter 11 case was filed in bad faith," which is odd because the Response concedes that certain facts support a finding of bad faith.[5] Further, the Circuit Court of Cook County already has made several findings that support a finding of bad faith and, under the *Rooker-Feldman* doctrine and issue preclusion doctrines*,* those findings are binding upon the parties.[6] *See In re Liptak*, 304 B.R. 820, 836–37 (Bankr. N.D. Ill. 2004) (Cox, J.) (*Rooker-Feldman* deprived bankruptcy court of jurisdiction to review state court divorce judgment).

Equally misleading is the Debtor's contention that the record in the State Court is not relevant to the good faith analysis. He accuses Movants of focusing too much on what transpired there. But there is no apology needed here because good faith analyses under § 1112 place great emphasis on the historical record that led to the filing of the chapter 11 case. Otherwise, how could a bankruptcy court make a finding of bad faith? The 'law's emphasis on what occurred in other proceedings prior to the bankruptcy makes the Debtor's prior conduct a major element of the bad faith inquiry, if not the dispositive element.

And the Debtor's cause is not helped by his concession that he is trying to use this Court to attack collaterally the Judgment. He contends "the filing of the instant case was necessary to … liquidate the amounts due the Support Creditors as determined by final and non-appealable orders," but Judge Bernstein already liquidated the amounts owed by a entering a judgment that is now final and appealable. Similarly, the Debtor's desire to "preserve the assets of the estate until

---

[5] For example, the Response concedes that the Debtor admits that the sixth, seventh and eight factors may possibly weigh against him in a bad faith analysis. Response at ¶ 18.

[6] For example, Judge Bernstein found that "Harlow commenced an 'illusory' course of conduct designed to remove all of his assets from himself and transfer them to his wife, Susan.  He has produced promissory notes one of which transfers all his assets to Susan in exchange for 'legal advice and service' she has rendered to him.  Susan is not an attorney. …  He has only created those notes in an effort to reduce his ability to pay child support."  *Id.* at 13.

such time as the State Court can issue final orders and an appellate court can review and address the State Court's reversible errors" is not a legitimate use of bankruptcy relief, particularly when Movants are the only true creditors in this bankruptcy. Response at pp. 1-2.

Finally, a finding of bad faith is warranted because the Debtor's next asserted need for bankruptcy protection – i.e., his inability to access readily the funds needed to pay Movants – is a self-made predicament and thus within his control to resolve, or it is un-resolvable and thus a bar to plan confirmation. Either he *does not* have the ability to persuade his wife to voluntarily relinquish any interest in the more than $6.5 million[7] needed to pay the amounts owed to the Movants on the effective date of the plan, in which case he cannot confirm a plan, or, he *does have* such an ability and he can pay Movants outside of bankruptcy. In either event, the Debtor does not need bankruptcy protection to liquidate assets. The Debtor and his wife are thus manipulating the bankruptcy laws to thwart, once again, his children from receiving the funds they have been awarded by a final and appealable Judgment. That is the essence of bad faith.

## II.   ARGUMENT

### A. The evidence already shows and will further show that this case was filed in bad faith

#### 1. Movants have shown by a preponderance of the evidence that this case was filed in bad faith.

Much of the Debtor's Response focuses on an analysis of the bad-faith factors the Court articulated for corporate debtors in *In re South Beach Securities, Inc.*, 341 B.R. 853 (N.D. Ill. 2006).[8] This is myopic, however, and belied by the very

---

[7] The amount needed will increase by the attorneys' fees that have been incurred by Movants to pursue their rights in the State Court and in this Court.  The Guardian Ad Litem filed a claim for over $1.1 million to replenish the 503(g) trust.

[8] Notably, the District Court reversed the bad faith finding Judge Goldgar made in *South Beach* securities, but ultimately the case was dismissed because the Debtor could not confirm a plan that was premised upon tax avoidance goals.  *In re S. Beach Sec., Inc.*, 376 B.R. 881, 888 (Bankr. N.D. Ill. 2007) ("Because South Beach

authorities the Debtor relies upon. It is well-settled that there are no hard and fast variables that determine bad faith and, indeed, the Debtor acknowledges that the Court is to consider matters on a case-by-case basis and to view the totality of the circumstances, including whether the debtor is a business or an individual. *See* Response at ¶ 8 ("As with intent, courts look at each bankruptcy filing on a case-by-case basis to determine whether factors indicative of a debtor's good or bad faith are present." (*citing In re South Beach Securities, Inc.*, 341 B.R. 853, 857 (N.D. Ill. 2006) (*citing In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir.2004)) ("Each bankruptcy petition, however, arises under different circumstances and raises particular concerns, requiring a court to examine the debtor's unique situation to determine where 'a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'"))).

*South Beach* also is instructive to this Court's analysis of this case. Although *South Beach* was not dismissed as a bad faith filing by the District Court and ultimately proceeded as a chapter 11 case, the result would have been different had the matter been addressed by the Seventh Circuit on a more complete record. *See In re S. Beach Sec., Inc.*, 606 F.3d at 378 ("the facts brought out in the confirmation hearing showed that the bankruptcy had been filed in bad faith."). After Judge Goldgar denied confirmation of *South Beach's* plan and the District Court affirmed, the matter ultimately was heard by the Seventh Circuit. In a scathing opinion, Judge Posner entered a rule to show cause against the debtor and others based upon his belief they were "orchestrat[ing] … a scheme aimed at a palpable misuse of bankruptcy," which "raise[s] serious ethical and perhaps legal concerns." *In re S. Beach Sec., Inc.*, 606 F.3d 366, 378 (7th Cir. 2010).

Similarly, in *Liptak*, 304 B.R. 820, 836–37 (Bankr. N.D. Ill. 2004), Judge Cox dismissed on bad faith grounds a chapter 11 case that is similar to this one. The case involved an individual chapter 11 debtor (unlike the above cases which largely

---

failed to prove that one impaired, non-insider class has accepted the plan, and because the U.S. trustee succeeded in proving that the principal purpose of the plan is the avoidance of taxes, confirmation of the plan must be denied."), aff'd *In re S. Beach Sec., Inc.*, 606 F.3d 366, 377 (7th Cir. 2010)

dealt with ongoing businesses) who filed for bankruptcy largely to address a judgment issued in favor of his ex-wife by a domestic relations court. In evaluating the debtor's *bona fides*, Judge Cox focused on two factors: (1) "the need for a bankruptcy case in light of the debtor's financial condition and the type of assets available for satisfying judgments" and (2) "the case's effect on creditors' non-bankruptcy collection rights and whether it is merely being used as a tactic to delay pursuit of these rights without any offsetting benefits to the creditor body." *Id.* at 830.

In evaluating those factors, Judge Cox found that the debtor had legitimate debts of only $2 million and assets of more than $10 million.[9] And while she indicated that insolvency is not a pre-requisite for bankruptcy, it "is a factor to consider in determining whether a debtor has filed in good faith because of his genuine need to preserve the going concern value of a business." *Id.* Similarly, the fact that the case was, like here, largely a two-party dispute, although not dispositive, "is also a relevant consideration. That is, … the more that the bankruptcy case appears to be a forum-shopping attempt for what is largely a two-party dispute the less the debtor has a need for the type of bankruptcy relief contemplated by the Bankruptcy Code." *Id. See also In re Casey*, 198 B.R. 910, 916-18 (Bankr. S.D. Cal. 1996) (debtor filed in bad faith when, among other things, case was filed after the family court announced a tentative decision and was just about to enter final judgment).

Based upon all factors, including the ones articulated in the *South Beach* case and in *Liptak*, Movants have met their burden of establishing by a preponderance of the evidence that this Chapter 11 case was filed in bad faith. The Debtor's schedules list assets of more than $20,600,000 million and legitimate debts (almost all of which are owed to Movants) of approximately $7,500,000.[10] In *Liptak,* Judge Cox

---

[9] Judge Bernstein already found that the Debtor's alleged obligations to his wife, Susan, and to his self-settled revocable trusts are illusory.  Ex. 1.

[10] As explained elsewhere, Judge Bernstein already concluded the Debtor's alleged obligation to his wife is baseless and the alleged debt to his self-settled trust is

found the Debtor's belief that he owed millions to his ex-wife to be baseless and a similar holding is warranted here based upon Judge Bernstein's findings. Also, like *Liptak,* the Debtor has embarked upon a scorched earth litigation strategy and is using the bankruptcy forum as the next venue for waging battle.

The following chart identifies and applies to indisputable facts the different factors used to evaluate whether a case has been filed in bad faith and shows that all factors favor dismissal.

| Good Faith Factor | Does the factor weight for or against dismissal in this case? | Analysis of Debtor's Filing |
|---|---|---|
| The debtor has any assets (*See In re South Beach Securities, Inc.,* 341 B.R. 863 (N.D. Ill. 2006) ("SBS") | For dismissal | The Debtor asserted in the State Court and in his 341 meeting that he transferred all his assets to his spouse or that most of his assets are exempt, whereas the Response argues the Debtor has plenty of assets. If the Debtor has no assets, dismissal is warranted and if he does have more than $20 million in assets, dismissal is still warranted because he does not need bankruptcy relief. |
| The debtor has recently transferred assets (SBS) | For dismissal | The Debtor transferred his interest in the Northern Trust Account into a tenancy by the entirety at the end of 2015 |
| The debtor has any employees (SBS) | For dismissal | Bankruptcy is not needed to preserve jobs or a business. |
| The debtor has any cash flow to sustain reorganization (SBS) | For dismissal | The Debtor's cash flow is more than enough to pay his ongoing obligations and he does not need bankruptcy protection. Third party creditors – e.g., American Express – have been paid and can be paid from the Debtor's earnings. |
| The debtor has any chance of confirming a reorganization plan (SBS) | For dismissal | The Debtor cannot confirm a plan for the reasons set forth *infra.* |

---

likewise not a true obligation that a creditor could enforce.  He spent his own money from the trust and recording a corresponding debt to repay himself for spending his own money is further evidence of bad faith.

| Good Faith Factor | Does the factor weight for or against dismissal in this case? | Analysis of Debtor's Filing |
| --- | --- | --- |
| The debtor and one of its creditors have reached a standstill in state court litigation (SBS) | For dismissal | The Debtor obtained unfavorable rulings in State court and concedes he filed bankruptcy to circumvent those rulings. *See In re LBJV, Ltd.*, 544 B.R. 401, 406 (Bankr. N.D. Ill. 2016) ("The Court notes that this case involves essentially the resolution of a two-party dispute and finds that this case was filed only to benefit from the automatic stay to evade state court orders."). |
| The debtor is trying to delay its creditors or reduce their rights (SBS) | For dismissal | The Debtor is unable to stay enforcement of a child support award under state law but is trying to circumvent that law vis-à-vis the automatic stay. The Debtor admits that his primary goal is to delay enforcement of the Judgment. |
| There are allegations of wrongdoing by the debtor or its principals (SBS) | For dismissal | 1. The State Court has ruled that the Debtor will go to great lengths to prevent his children from obtaining the child support they deserve; 2. During the state court proceeding, the Debtor violated a protective order and submitted a false financial affidavit, and Movants are seeking sanctions against him for that misconduct. *See* MTD at Exs. K and L. 3. In the State Court, the Debtor argued he transferred his assets to his wife. This was done to keep the assets out of the State Court proceeding and appears to have been a fraud on that court. 4. The Debtor has fraudulently created obligations in favor of his wife. As found by Judge Bernstein (Ex. 1), the Debtor and his wife manufactured these debts to try to reduce his ability to pay child support. 5. The Debtor has submitted false or misleading testimony under oath in this case. (MTD at p. 9.) |
| Bankruptcy offers the only possibility of preventing the loss of property (SBS) | For dismissal | Bankruptcy does not offer any advantages for preserving property. The Debtor's property consists of more than enough cash to pay his debts to his children. |

| Good Faith Factor | Does the factor weight for or against dismissal in this case? | Analysis of Debtor's Filing |
|---|---|---|
| The Debtor's non-support claims are illegitimate | For dismissal | The Debtor and his wife manufactured obligations between themselves to hinder, delay and defraud his children. |
| The Debtor filed bankruptcy to obtain a stay pending appeal of an obligation he can pay | For dismissal | *Liptak*, 304 B.R. at 836–37 ("If the debtor's only purpose for filing the case is to delay (or defeat) a single judgment creditor, and the case has little or no ability to benefit the creditor body as a whole, then the debtor has not filed the Chapter 11 in good faith."); *In re Schwartz*, 799 F.3d 760, 764 (7th Cir. 2015) (affirming dismissal of chapter 7 case for cause based on "an unjustified refusal to pay one's debts"); *In re Garzon*, No. 18 B 26026, 2018 Bankr. LEXIS 3818, at *13–14 (Bankr. N.D. Ill. Dec. 3, 2018) (finding bad faith when debtor filed chapter 13 case "to gain the benefit of the automatic stay, postpone payment of the debt to his ex-wife, and, if he plays his bankruptcy cards right, never pay the debt at all"). |
| The Debtor filed false bankruptcy schedules | For Dismissal | *See* MTD at p .9. – The Debtor listed many assets in his schedules, with a disclosed value of $20,641,520.05. But at the § 341 meeting, the Debtor admitted that he disclosed only half of the value of many of the assets. [11] MTD, Ex. G at 38:19–39:8. He testified that he listed the assets only "for disclosure purposes," "to inform [parties] as to what property out there is an attachment to me." *Id.* at 38:25–39:3, 41:18–19. In fact, he claims, he gave all his property to his wife. *Id.* at 39:9–15. He believes that he does not own any personal property and may not own any real property. *Id.* at 41:21–42:2. |

---

[11] The Response argues that Movants failed to recite other portions of the transcript for the Debtor's 341 meeting, but this misses the point. The Debtor was under oath

### 2. The Debtor has not met his burden of establishing that he can confirm a plan within a reasonable time.

Because Movants have met their burden of establishing by a preponderance of the evidence that the Debtor filed chapter 11 in bad faith, the burden then shifts to the Debtor to prove he can confirm a plan within a reasonable time. He has not come close to meeting that burden. The Debtor concedes that "his ability to confirm a plan of reorganization depends upon his ability to provide for the payment of the claim of the Support Creditors, in full, on the effective date," (Response at ¶ 17) but does not explain how that goal will be met. Movants are owed an additional $4.5 million (after including the $2 million already in escrow), plus more than a million due to the mounting legal fees. The Debtor's schedules reflect that he does not have those funds at his complete disposal precisely because of his gamesmanship and efforts to thwart Movants by transferring an ownership interest in such funds to his wife. The Debtor does not guarantee that his wife will consent to the use of alleged joint funds and absent such an assurance, the Debtor lacks the resources to pay Movants in full on the Effective Date.

The Response also largely ignores the Debtor's ability to confirm a plan. Instead of a detailed analysis of this important factor, the Debtor blithely contends that "[b]ased upon the Debtor's multiple sources of income, and his ability to liquidate assets, given sufficient marketing time, the Debtor meets the feasibility test." Response at ¶ 16. Notably, the Response does not delineate the phrase "sufficient marketing time" nor does it explain why any time is needed to liquidate the retirement accounts or the Northern Trust account. These resources are already liquid. Also notable is that the Debtor does not have "sufficient marketing time" to liquidate other assets because he concedes that he must pay the claims of Movants on the Effective Date of the Plan. Similarly, the Debtor does not explain what assets he will market and sell and whether his wife, who claims an interest in such assets, will

---

during the entire meeting and if, as the Response contends, the Debtor contradicted himself in the transcript, that is further evidence of bad faith.

consent to the sale or will, instead, fight like she has in the past to prevent the Debtor from using assets to pay the debts he owes to his children.

Based upon undisputed arguments and evidence, the Debtor cannot credibly argue that he can confirm a plan within a reasonable time. Thus, dismissal is warranted.

## B. The Debtor's effort to whitewash the evidence of bad faith is unavailing.

The Response seeks to whitewash the Debtor's conduct by relying upon arguments that upon close scrutiny are shown to be vacuous. In this respect, the Response generally suggests that (1) large judgments are a common reason for filing for chapter 11 relief, (2) the filing of this case may delay the payments to creditors, but it will not reduce their rights; (3) the Debtor did not collude with his wife to keep assets out of the hands of his creditors or lie under oath, (4) the filing of this case was the only possibility to avoid the Receiver's costly and time-consuming liquidation of the Debtor's assets; (5) the Debtor's transactions with his wife are not relevant to a consideration of whether this case was filed in bad faith; (6) there are other creditors in this case besides the Movants; and (7) the Debtor did not lie under oath when he said that he gave all of his property to his wife because he is not a lawyer and did not understand the import of the transactions with his wife. As explained below, none of these arguments have merit.

### 1. Pulling the bankruptcy trigger because of the entry of the Judgment establishes bad faith and is not a legitimate purpose for this case.

Citing *In re Dilling*, 322 B.R. 353, 362 (Bankr. N.D. Ill. 2005), the Response argues that bankruptcies often are filed to address large judgments and doing so here is thus not outside the pale. In fact, the analysis in *Dilling* supports dismissal and helps highlight the Debtor's bad faith. In *Dilling,* Chief Judge Hollis specifically noted that when a debtor files for bankruptcy to stay enforcement of a large judgment they can afford to pay, bad faith exists. Judge Hollis specifically distinguished *Dilling* from *In re Liptak*, 304 B.R. 820 (Bankr. N.D. Ill. 2004), where bad faith was found when a debtor had substantially more than enough assets to pay the judgment, but instead preferred bankruptcy to try and collaterally attack

the judgment and avoid posting an appeal bond. In *Dilling,* the debtor would be left destitute if she had to pay the underlying judgment, which is the reason the case was not dismissed. Here, of course, the Debtor will retain substantial assets once he pays the child support awarded by the Judgment. Thus, *Dilling* is readily distinguishable from this case and in light of its discussion of *Liptak*, it lends support to a finding of bad faith.

### 2. This bankruptcy case harms Movants.

The Debtor's contention that this bankruptcy case does not harm Movants' rights is irrational. Not realizing the internal inconsistency in the argument, the Debtor asserts "[t]he filing of this case may delay the payments to creditors, but it will not reduce their rights." Response at ¶ 19. Delaying payment to a creditor by its very definition reduces a right: the right to prompt payment. After almost a decade of litigation involving tribunals on 3 continents, Judge Bernstein finally entered a Judgment last November for future support of more than $6.5 million. That Judgment has now become final and appealable. Because the Debtor concedes he filed bankruptcy to stay enforcement of that Judgment, he cannot in the next breath argue that Movants are not being harmed by his actions. It just does not make sense.

Approximately 6 months have passed since entry of the Judgment, and only a portion of the award has been paid into an escrow that the Movants cannot access because of the pendency of this case, and even that was done only because this Court ordered it done. That plainly constitutes the type of harm that bankruptcy courts consider when evaluating a debtor's *bona fides* in filing for bankruptcy relief.

Equally specious is the Debtor's contention that he has been paying ongoing child support of $33,000 a month. Response at ¶ 19 ("With respect to the Support Creditors claim, the Debtor is paying current support in the amount of $33,000.00 per month."). The money used to pay such amounts originated from the 503(g) trust that Judge Bernstein ordered established because of the Debtor's continued unwillingness to provide adequate support for his children and propensity for excessive litigation. Those funds are not the Debtor's (they are not estate property)

and they belong to the children. Thus, the payment of support from those funds is not tantamount to the Debtor paying child support and instead represents the children paying themselves. In fact, Judge Bernstein recently pointed this out when the Debtor's counsel argued that he was paying support. And although Judge Bernstein recently ordered the Guardian *Ad Litem* to issue a wage deduction order to the Debtor's employer, it is not yet known whether any funds have been withheld.

### 3. This case is a two-party dispute.

There also is no merit to the Debtor's contention that he has multiple creditors who would be harmed if the case is dismissed. Although the Debtor's schedules list his wife and his trusts as creditors, that fact alone cuts strongly in favor of dismissal because it shows that the Debtor is trying to game the bankruptcy system. As explained previously, the alleged claims of Susan Higinbotham are fabricated. Judge Bernstein made a finding that supports this conclusion and it is binding:

> Harlow commenced an 'illusory' course of conduct designed to remove all of his assets from himself and transfer them to his wife, Susan. He has produced promissory notes one of which transfers all his assets to Susan in exchange for 'legal advice and service' she has rendered to him. Susan is not an attorney. … He has only created those notes in an effort to reduce his ability to pay child support.

Ex. 1 at 13.

Additionally, the alleged debts to the Higinbotham trusts represent amounts the Debtor essentially owes himself for distributions taken. Those are not debts and listing them as such is further evidence that the information in the Debtor's schedules is false and misleading.

### 4. This case serves no legitimate purpose and is not needed to liquidate assets efficiently.

The Debtor next contends that bankruptcy was needed to avoid the Receiver's costly and time-consuming liquidation of his assets. But the Debtor does not explain why this would be a costly and time-consuming endeavor if done by the Receiver

and not costly and time-consuming if done by the Debtor. If the liquidation of the
Debtor's assets will be time-consuming and expensive, then that undermines his
ability to confirm a plan. It also is a self-inflicted harm that the Debtor presumably
can avoid by cooperating with the Receiver and by persuading Susan Higinbotham
to do the same. And if the Debtor cannot persuade his wife to cooperate with the
Receiver's actions, there is no reason to believe she will cooperate with the
liquidation of assets under a plan.

And while the Debtor seems to believe this case serves a valid purpose
because it allows him to stay enforcement of the Judgment entered against him
while he pursues an appeal of the order he claims to have been entered in error, this
is not a valid bankruptcy purpose when, as discussed above, the Debtor has enough
assets to pay the Judgment and no creditors will suffer if the Judgment is paid.

### 5. The Debtor has not taken his duties as a debtor in possession seriously.

After the Debtor's wife discovered in September of 2009, that he had fathered 3
sons in Thailand, the two of them implemented a plan to transfer his assets to her so
that his children would not enjoy any of the benefits of his wealth. Ex. 1 at 13. As part
of that plan, the Debtor submitted a false financial statement to the State trial court to
persuade it that he was penurious and could not afford to pay much in child support.
Judge Bernstein saw through the Debtor's antics and entered a child support judgment
of more than $6.5 million, which included a retroactive award of $4.5 million and is
likely to increase substantially due to the accrual of more than $1 million in legal fees
spent to enforce the rights of the Movants. Rather than admit that he had lied in the
State Court, the Debtor elected to carry his charade into the bankruptcy proceeding,
which explains his testimony at his 341 meeting wherein he claimed under oath that
he does not own any personal property and that he has given his wife everything he
owned. MTD at 9.

The Response is thus, again, misleading when it asserts that the Debtor has
behaved himself as a debtor in possession. He has not. His false testimony at the 341
meeting provides ample grounds to deny his discharge either on the basis that he lied
under oath or that he exhibited a reckless disregard of the truth. And although his

attorneys try to walk back the Debtor's false statements, they cannot erase the transcript of the 341 meeting where the Debtor put on the record his belief that he transferred all his property to his wife. *Id.*

The Debtor also submitted a false oath when he listed his Northern Trust account as exempt – it is not – and when he listed his residence as being in Joliet. He lives at 1500 North Lake Shore Drive. He also submitted a false oath when he listed his wife as the holder of a claim in an unknown amount for "promissory notes and periodic advances" and when he stated at his 341 meeting that he owed her "something north of $10 million" for "her help on various things." 341 Tr. at 24:4:13. Once again, these statements are remnants of the Debtor's efforts to persuade Judge Bernstein that he cannot pay any child support and, rather than turn over a new leaf post-petition and disclose his true financial condition, he continues to play games. That strategy did not work in the State Court and it should not work here either.

## C. The Debtor cannot establish the required elements under §1112(b)(2) to avoid dismissal of this case.

The Debtor asserts that, even if dismissal is warranted under § 1112(b), it should be avoided because "this case involves very unusual circumstances and large sums of money" and because "[t]he level of animosity and litigiousness between the parties is extreme which only serves to delay and thwart the Debtor's reorganizational goals."[12] Admittedly, there has been a lot of litigation, but the Debtor has been the instigator of such litigation and it would be strange indeed to allow the Debtor to use the threat of further litigation as a weapon to remain in bankruptcy. As noted above, Judge Bernstein already found the Debtor to be "extraordinarily, if not vexatiously, litigious." Ex. 1 at 13.

Nor is there any merit to the Debtor's contention that he can keep his exempt assets off limits from Movants and thus they must kowtow to his desire to remain in

---

[12] Although the Response asserts that this case should not be dismissed because the Debtor is seeking to liquidate a non-qualified deferred compensation plan, this argument actually weighs in favor of dismissal because the Debtor withdrew the motion to liquidate this plan.

bankruptcy. Under Illinois law, exempt property can be seized to pay child support, and thus the Debtor's cooperation or agreement to tender such property to Movants is an empty gesture at best and certainly not a reason to keep this case in Chapter 11. *See* 750 Ill. Comp. Stat. Ann. 28/15 ("Income" means any form of periodic payment to an individual, regardless of source, including, but not limited to: … pension, and retirement benefits, …"). *See also In re Marriage of Radzik*, 353 Ill. Dec. 124, 140, 955 N.E.2d 591, 607 (2011) ("retirement accounts are not exempt under section 12-1006 from judgment for support orders").[13]

Dated: March 28, 2019

**Wipaporn Teekhungam**, **A.H**, a minor, **A.H.**, a minor, and **A.H.**, a minor


  By: /s/ William J. Factor
One of Their Attorneys

William J. Factor (6205675)
Deborah K. Ebner, Of Counsel (6181615)
Jeffrey K. Paulsen (6300528)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel: (847) 878-6976
Fax: (847) 574-8233
wfactor@wfactorlaw.com
dkebner@deborahebnerlaw.com
jpaulsen@wfactorlaw.com

---

[13] Thus, the Debtor is wrong when he asserts that exempt assets and assets held in tenancy by the entirety cannot be reached by Movants if this case is dismissed. Response at ¶¶ 43-44.



+IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-DOMESTIC RELATIONS DIVISION

| | | |
|---|---|---|
| IN RE: THE PARENTAGE OF | ) | |
| | ) | |
| WIPAPORN TEEKHUNGAM | ) | |
| a/k/a Chirathip Teekhunngam, | ) | |
| Individually and on behalf of | ) | |
| ███████████████████████, | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | No. 11D 6475 |
| | ) | |
| and | ) | |
| | ) | |
| HARLOW NILES HIGINBOTHAM, | ) | |
| Respondent. | ) | |

## JUDGMENT

**THIS CAUSE** having come on for hearing on Petitioner Wipaporn Teekhungam

(hereafter Wipaporn) 's " First Amended Petition to Enroll Foreign Judgment Confirming Father

and Children's Relationship(s), for Enforcement of Thailand Judgment, and Collection of Child

Support, Modification, Recalculation, and for Attorney Fees and for Contract Enforcement."

The Petitioner being represented by Jemma Allen and Michael Levy from the firm of Allen &

Glassman, Chartered. The Respondent, Harlow Higgenbotham (hereafter Harlow) being

represented by Beerman, LLP. And in addition, at later stages, by Wetnzel law Offices. The

children were represented by Michael Ian Bender of the Law Offices of Michael Ian Bender

as Guardiam ad Litem and Howard Rosenfeld and Vanessa Hammer, Rosenfeld Hafron

Shapiro & Farmer as attorney for the child. The Receiver was Neal H. Levin, Shira R.

Isenberg and Elizabeth L. Janczak of Freeborn & Peters LLP.

1

The Court, having jurisdiction of the parties and the subject matter and being fully advised;

**FINDS**

## HISTORY OF CASE

. At all times, Harlow was married to his American wife, Susan. Wipaporn and Harlow began a relationship in Bangkok Thailand in 2001, when Wipaporn was 23 and Harlow was 53. Harlow is a graduate of Harvard and received his masters from the University of Chicago. Wipaporn appears to be of working class Thai heritageThereafter, they had approximately a 10 year adulterous relationship. They apparently met on an average of 3 to 4 times a year when Harlow would visit Thailand. At some point, Harlow entered into a Thai religious marriage ceremony with Wipaporn. (There are photographs showing that the ceremony was public and allegedly Harlow gave Wipaporn's father a dowry payment). Harlow did not register the marriage so it was not considered a valid marriage in Thailand The parties exchanged marriage vows. The parties determined that they should have children together. The parties underwent IVF treatment using Harlow's sperm and Wipaporn's eggs. In November 5, 2008 Wipaporn gave birth to the parties triplet sons.

In order to acknowledge his parentage, Harlow sent his passport to Thailand and insisted the three boys be given his family names ███, ███, and ███ and that they receive United States citizenship.

It appears from e-mails, in evidence, that Harlow promised Wipaporn many things in order to induce her to have children with him, including, but, not limited to; that he would buy her a house, he would send the children to the best private schools, and, he would provide all

2

three with trust funds for their college educations. Harlow sent Wipaporn funds to purchase a house, a commercial building and some vacant land. He also gave her the use of his credit card.

Sometime in 2009, Harlow appeared to have a change of heart and he stopped supporting his children, forcing Wipaporn to file a lawsuit against him in Thailand for child support. Harlow did not personally appear in the Thai court, but, was represented, at all times, by counsel. The Thai court found Harlow to be the father of the children, as a DNA test had confirmed his parentage of ███████ ██████ and ███████.

On December 21, 2010, the Thai Court ordered Harlow to pay a monthly sum for the support of his children, the equivalent of $500.00 per month for each of the then two year old triplets. Harlow appealed the Thai court decision, and, when the lower court decision was affirmed, he appealed to the Supreme Court of Thailand which also affirmed the decision of the two lower courts.  During this period of time, Harlow did not comply with the Thai order and refused to pay any child support. Harlow's willful refusal to comply with the Thai court order compelled Wipaporn to file a cause of action in the Circuit Court of Cook County (where Harlow is a resident) asking to register the Thai judgment in the Illinois courts for enforcement purposes (among other requests). The Thai judgment was duly registered in the Illinois court on March 18, 2013. Harlow appealed that order, and, on December 2, 2016, the Appellate Court, First District of Illinois affirmed the lower court's decision, allowing the registration and finding that the Thai decision was res judicata,

Wipaporn then moved for the instant Court to modify the child support amount, as the Thai award was insufficient for support of the three minor children.

3

Shortly thereafter, Harlow filed suit in England against Wipaporn , (where she now resides having married Winton Perry,(hereinafter Winton) a British citizen), claiming she had violated an agreement between the parties to keep their relationship private. There was a finding against Harlow in that lower court, which he appealed to the High Court of Justice, Queen's Bench Division, Media and Communications List. In a very lengthy and detailed decision, High Court justice the Hon. Nicklin, found against Harlow and denied his appeal. This court has been informed and Harlow confirmed that he is appealing that decision also.

The instant case proceeded in this court, from time to time, until on its own motion, the court appointed Michael Ian Bender as Guardian Ad Litem. (hereafter GAL) (The court originally appointed him as Child's Representative, but, at the request of Harlow the appointment was modified to that of GAL) The GAL traveled to England to interview the children, their parents and to observe their living conditions and determine the needs of the children. Upon receiving the GAL report, this court learned of the difficult condition of the children.

The Thai Court had issued a Certificate of finality, as it is clear that Harlow would not comply with any Thai order (as he had not done so in the past) The British court declined to hear the case. This court determined that there was no other court where the children could be granted the relief they require.

Therefore, the court took jurisdiction for the purpose of modification of child support. This decision was made after hearing about the condition of the children in England, of their needs for medical treatment, tutors and their inability to participate in extracurricular activities due to a lack of resources. The motion also contained a pleading that the court comply with

4

certain immigration requirements in England. (The court announced that the immigration issues would not be heard, as those issues would not factor into the court's decision as to the best interest of the children and would require an interpretation of a foreign statute).

The court cannot consider speculative issues and must decide on current facts. The court allowed Harlow to make an offer of proof as to "some person from England"', who would testify to the fact that Wipaporn was due to be deported. The offer was not in the form of a report and it is unclear to the court who the witness would be, how he/she became aware of the "facts" and when/how this information was obtained. At the close of the offer, Harlow did not move for entry of the offer into the record. During the 9 days of testimony, Harlow continued to raise the issue that Wipaporn was illegally in the United Kingdom and would be deported. The court continued to remind Harlow that the best interests of the children would be the major factor as to child support in the court's decision. Further, Harlow had already been found to be the biological father and therefore, owed the children the obligation of support. Harlow's attorney sought to exclude the GAL from the hearing since the GAL would be a witness. The court, therefore, appointed Howard Rosenfeld as attorney for the children.

During his responses in "testimony" Harlow sua sponte, continually corrected the form of Wipaporn's attorney's questions and stated repeatedly that the triplets were not his children. He stated that his attorneys in Thailand were incompetent and the DNA test inaccurate.

## JURISDICTION

In *Vailas v. Vailas*, 406 Ill.App.3d 32 (1st Dist. 2010), The appellate court noted that UIFSA treats jurisdiction of an action to modify an order that is already in existence differently than an action to establish or enforce an existing order. The Act specifically states that the UIFSA may

5

not be used to acquire personal jurisdiction for a tribunal to modify a child support of another state, unless the requirements of the Act are met.

The appellate court went on to note that, in an action to modify a support order of a foreign state, not only must the courts of this state have personal jurisdiction over the obligor, but the requirements for modification of a foreign state support order as set forth at 750 ILCS 22/201(b) and 22/611 also must be met.

The appellate court noted that, under 750 ILCS 22/611(a), a previously issued child support order may be modified only if, after notice and hearing, the circuit court finds that one of two sets of conditions is met:

1. The order may be modified if

    a. neither the children, nor the petitioner who is an individual, nor Harlow reside in the issuing state;

    b. a petitioner, who is a nonresident of the state, seeks modification; and

    c. the respondent is subject to the personal jurisdiction of the Illinois tribunal.

In the case at bar, neither the parties nor their children are in Thailand. In fact, Wipaporn and her children moved to Great Britain in 2013 and have been out of Thailand for nearly 6 years. Wipaporn is a nonresident of Illinois, living in Great Britain and Harlow is a resident of Illinois and has filed his appearance and actively participated in the case at bar.

*IRMO Edelman* (2015 IL App (2d) 140847 (2nd Dist.) An agreed order was entered enrolling a foreign judgment (Connecticut dissolution). Both parties and children resided in Illinois. Ex-wife filed in Illinois for contribution to college expenses, to increase child support and establish "adult child support" for a disabled child. Appellate Court affirmed that trial court had jurisdiction to modify child support under the Family Support Act because both parties had resided in Illinois when the Connecticut judgment was enrolled in I., by agreement and mom had sought enrollment in order to "modify and/or enforce" it. The court held that an Illinois tribunal could not modify any aspect of the child support order that may not be modified under the law of the issuing state, including duration. In this matter, pursuant to 611(c) and (d) the law of the issuing state (Connecticut) governed the availability of the relief mom was seeking – college contribution (which was not available pursuant to Connecticut law) and duration of dad's child support obligation. This was true even though the court's authority to modify arose from section 613, as section 611 still applies (see language of 613).

Thus the question, does Thai law provide for modification of a child support order? Under Thai law maintenance for child support may be claimed between parent and child when the child entitled to maintenance has been furnished with insufficient support for his condition in life. Title III, Section 1598/38 Thai Civil and Commercial Code

Further when any party can show a change in circumstance or in the means or condition of life of the parties, the Court may cancel, reduce, increase or re-establish the amount of maintenance. Title III, Section 1598/39, Thai Civil and Commercial Code.

This Courts authority to modify child support is found in Section 510 of the IMDMA which states:

*Except as otherwise provided in paragraph (f) of Section 502 and in subsection (b), clause (3) of Section 505.2, the provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to due notice by the moving party of the filing of the motion for modification. An order for child support may be modified as follows:*

*1.  Upon a showing of a substantial change in circumstances and…*

## CHANGES IN CIRCUMSTANCES TO JUSTIFY AN INCREASE IN CHILD SUPPORT

The changes in circumstances in the instant cases are:

1. The triplets are 8 years older ( The first support order having been issued when they were approximately 2 years old)
2. Wipaporn has married a British citizen and moved to England.
3. The triplets are in a school at Hayford Park Free School, which does not challenge ██████████ ) and does not provide extra necessary help for ██████ .
4. ██████ has developed asthma as well as a serious skin condition, Vitiligo. This condition causes a loss of pigmentation not only on his skin, but, is currently affecting his eyesight. This latter condition is not being properly treated due to the lack of private health care.
5. Wipaporn is prohibited from working due to her status as "overstayer" , in the UK.
6. Wipaporn owned a home in Thailand which she lost due to the high demand of legal fees.
7. Wipaporn owned a car in Thailand which she was forced to sell due to the high cost of legal fees to defend and prosecute actions against Harlow.
8. Wipaporn had health insurance in Thailand, which helped with the various illnesses of the triplets
9. Wipaporn had life insurance in Thailand, which she had to abandon due to the drain on her assets from the ongoing litigation

7

10. There are no funds for the boys to participate in sport clubs
11. Wipaporn is in considerable debt due to her efforts to defend herself and the three boys from Harlow's incessant litigation
12. The boys have never been able to take a vacation due to the inadequate child support award and the fact that Harlow has willfully failed and refused to pay the meager amount ordered by the Thai court until the Illinois court registered the Thai judgment and was then able to require him to pay the ordered amount.
13. The boys are growing quickly which necessitates new shoes every 3-4 months
14. The boys are growing quickly which necessitates more expensive bigger clothes and uniforms for school
15. There are insufficient funds to be able to provide the boys with iPads or tablets for school.
16. There are insufficient funds for the boys to be able to attend summer sports camps
17. The boy's standard of living is so low, the family receives public assistance.

Wipaporn has met her burden of proof that a substantial change in circumstances has occurred justifying an increase in child support.

*After the threshold question of whether a substantial change in circumstances has occurred is answered, then and only then ay the court determine the amount of the increase in child support. (Fedun v. Kuczek (1987), 155 Ill App.3d 798, 801, 108 Ill.Dec.370, 372, 508 N.E.2d 531,533)*

## CHILD SUPPORT INCREASE

*After the court finds a substantial change in circumstances under section 410(a) , the same factors are considered in setting the amount of modified child support as were considered in determining the original amount under section 508. Fedun (1987), 155 Ill App.3d 798, 801, 108 Ill.Dec.370, 372, 508 N.E.2d 531,533)*

Modification
750 ILCS 5/510 Modification and termination of provisions for maintenance, support, educational expenses, and property disposition.

(a) except as otherwise provided in paragraph (a) of section 502 and in subsection (b), clause 3 of Section 505.2, the provisions of any judgment respecting maintenance or support may be modified only as to installments accruing subsequent to due notice by the moving party of the filing of the motion for modification. An order of child

8

support may be modified as follows: one upon a showing of substantial change in circumstances...

750 ILCS 5/505 (1) and (2) define the amount of child support to be paid and give guidance to the factors the court should consider in any modification in child support: Paragraph one (1) states that the court shall determine the minimum amount of support by using the following guideline: 32% of the supporting party's net income for three children. Wipaporn does not have any other children and Harlow has now had a child with his wife. However, paragraph two (2) states " The above guidelines shall be applied in each case unless the court finds that a deviation from the guidelines is appropriate after considering the best interest of the child in light of the evidence, including, but not limited to, one or more of the following relevant factors:

    (a)  The financial resources and needs of the child;

    (b)  The financial resources and needs of the parents;

    (c)  The standard of living the child would have enjoyed has the marriage not be dissolved.

    (d)  The physical, mental and emotional needs of the child; and

    (e)  The educational needs of the child.

If the court deviates from the guidelines, the court's finding shall state the amount of support that would have been required under the guidelines, if determinable. The court shall include the reason or reasons for the variance from the guidelines.

Section (2.5) states that the court, in its discretion, in addition to setting child support, pursuant to the guidelines and factors, may order either or both parents owing a duty of support to a child . . . to contribute to the following expenses, if determined by the court to be reasonable:

9

(a)  Health needs not covered by insurance;

(b)  Child care;

(c)  Education;

(d)  Extracurricular activities.

It is well settled that the trial court's decision to deviate from the statutory guidelines will not be disturbed unless there is an abuse of discretion.  In this case, Harlow's monthly income is estimated by the court to be $133,113.84.  The court cannot determine his exact income because he provided a handwritten, self-prepared, purported tax return, in which he took deductions for false claims of theft. He also testified that he regularly borrowed from family trusts, of which he is the beneficiary as well as trustee. Such regular "loans" should be incorporated into his income in order to obtain a correct income.  Taking his figures from his 2016 return and adding back in $227,629.68 "manufactured" loss which he took and his tax refund of $71,154.18 gives an adjusted net of $1,597,366.11 or $133,113.84 per month. A guideline child support amount for the three boys would therefore be $42,596.42 per month. Harlow argues that there should be a downward deviation from guideline child support and the court should only consider the child's actual expenses.  However, that is not the law, as the court must consider all relevant factors in 505. The court believes that sufficient funds to provide for the children  can be realized at a below guidelines amount.  The court will, therefore, set a child support amount that is below the $42,596.42 monthly child support amount (*In re the marriage of HILL,* 2015 Ill App 2d (140345).

 The Illinois court was able to take jurisdiction to modify the Thai judgment when all the above noted conditions were met and no one resided in Thailand. As of March, 2013, Wipaporn and the triplets left Thailand and moved to the UK.

 Wipaporn testified that she is prohibited from working in the UK because she is an

10

"overstayer". This was not challenged by Harlow. The triplets' mother and stepfather devote all of their free time and the vast majority of their assets to raising these boys. Wippaporn stays home so that she can help the boys in whatever way is needed, including, but, certainly not limited to; taking them to doctor's appointments, taking them to school, and taking them to the park where, unfortunately, they get to watch other children participate in club activities. (The triplets are unable to participate because of the lack of funds).

It would not be in in the triplets' best interest to change something that has been working so well and declines to obligate Wipaporn to obtain full time employment especially since it would be illegal.

Harlow argues that the court cannot increase child support due to a change of circumstances because he refused to inform the Thai court of his finances, therefore, prohibiting the court from finding that there had been a substantial change in circumstances. The court rejects this argument.

When dealing with a parent who has a high income, the trial court must balance the concerns that (1) child support should not be a windfall and (2) the standard of living that the child would have enjoyed absent dissolution of marriage.  What Harlow has failed to understand is that child support is not solely based on the child's shown needs (*In re the marriage of HILL.* Ibid).

PRIVATE SCHOOL

*750 ILCS 5/505(2.5) The court, in its discretion, in addition to setting child's support pursuant to the guidelines and factors, may order either or both parents owing a duty of support to a child of the marriage to contribute to the following expenses, if determined by the court to be reasonable:*

  *(a). health needs not covered by insurance*

11

(b) *child care ;*
(c) *education; and*
(d). *extracurricular activities.*

As long as Wipaporn is able to be home with the boys, there is no need for daycare. In the event that she is able to return to work, then the court would consider an award of daycare costs from Harlow.

 Wipaporn is asking that Harlow send the boys to private school. She and her husband, Winton testified credibly as to how the boys' education and lives would be improved by attending a private school. The classes are smaller, the curriculum is much broader and the activities are generally more varied. They testified that son ███████, is a very bright student and is not being challenged at the current school, which allows him to become lazy. They feel that if he goes to a more challenging school, he will excel. ███████ is the smallest of the children, having some nutritional problems that keep him from gaining weight. ███████ has a learning disability for which his current school does not provide any support to improve the situation.

Harlow not only attended private boarding school as a youth, he attended Harvard University and the University of Chicago, both very expensive private schools. There does not seem a reason that he should not be required to pay for the triplets' private school tuition especially in light of his earlier promises to do so. Wipaporn testified that her husband, Winton, provided information to the court as to their choice of private school which is known as the Dragon School. Later, Winton testified, credibly, as to how he came up with the cost of the school at $11,000+ per month per child.

It would be in the children's best interest to attend the Dragon school for their education and for Harlow to pay for same; however, the court declines to order private school tuition at this time.

The boys appear to have some interest in extracurricular activities and as they are getting older a reasonable part of their education would be to participate in sports and other out of school activities such as music, playing musical instruments and the like. The court took this into consideration when setting the increased amount in child support.

## 503G TRUST

750 I LCS 5\503 (g). Provides;
*The court if necessary to protect and promote the best interest of the children may set aside a portion of the jointly or separately held estates of the parties in a separate fund*

12

*or trust for the support, maintenance, education, physical and mental health, and general welfare of any minor, dependent or incompetent child of the parties.*

Harlow is extraordinarily, if not vexatiously, litigious. He has appealed the decision finding him to be the father of these children to the Supreme Court of Thailand. He has sued Wipaporn in England concerning a Facebook page that she had up for a couple of months and took down. (He claimed it was an invasion of his privacy). When he lost that case he filed an appeal and he has recently lost that appeal and testified that he has deposited $25,000 with an attorney to take that matter up to the next higher court in Great Britain. When the Illinois court registered the Thai decision for the purposes of enforcing the child support, he appealed that matter. He also lost that appeal.

During the current litigation, he has appealed two separate issues and has asked the Supreme Court of Illinois for a supervisory order. When asked if there was a limit to the amount of funds that he would spend litigating this case in order to preclude having to support his sons, he answered in the negative. In the last day of testimony, he indicated that he would continue to litigate this issue until "he receives justice" which the court took to mean his not being obligated to support his sons.

Harlow has caused amendments to be executed changing the definition of descendants in several trusts of which he is the beneficiary and trustee. Said trusts provide for the remaining corpus to go to his "legitimate" descendants thereby excluding his triplet sons.

In addition, Harlow testified that he has, at the age of 71, had a child with his current wife (Susan is 66) so that he would have a descendent as beneficiary of these trust.

Harlow has commenced an "illusory" course of conduct designed to remove all of his assets from himself and transfer them to his wife, Susan. He has produced several promissory notes one of which transfers all of his assets to Susan in exchange for "legal advice and service" she has rendered to him.  Susan is not an attorney. Although the promissory notes are years old, he has done nothing to actually transfer funds to Susan. He has only created those notes in an effort to reduce his ability to pay child support.

It is common for a payor to be required to pay for life insurance in an amount sufficient to provide for the support and education of his/her minor child. Considering the age of the Respondent and the amounts that would have to be covered, it would be prohibitively expenses to require him to provide such a policy.

The court finds that due to his advanced age and his obsessive tendency to deny his parentage of the triplets and refuse to pay support, that should the court fail to establish a 503(g) trust not only would he make no provisions for these children in the event of his

13

demise (thereby engendering further litigation in the probate court) but, would take active steps to insure that the triplets were omitted as his descendants under the original terms of those trusts.

## CREDIBILITY

Wipaporn testified in a clear manner. Her speaking and understanding of verbal English was good, Several times she apologized as her ability to read English was not good. Often she responded to questions that the questioner would have to ask her husband, Winton about numbers on her financial affidavit or where the numbers came from for the estimates on cost of the boys' expenses. She was credible, but, not sophisticated or knowledgeable and so she deferred to her husband, which led the court to an understanding about why, as a very young woman, she would fall victim to a much older wealthy man like Harlow.

Winton testified in a straight forward, matter of fact manner. He was able to clearly explain the numbers on the financial affidavits and how he had estimated the cost of private school. He had a clear understanding of the boys' needs and was able to communicate that information in an understandable manner.  He was credible.

Harlow was not credible; for instance notwithstanding the facts proven and affirmed in the Thai courts he incessantly claimed that the triplets were not his children

In addition, Harlow claimed on his financial affidavit dated 10/26/2017 that Wipaporn had fraudulently referred to herself as his "wife" when he had himself referred to her as his "own true wife" and that the children were legitimated (sic)after a fraudulently obtained court order in Thailand. Harlow chose not to present himself to the Thai court, but, was represented by attorneys.  His original claims were "He had not had a sexual relationship with Wipaporn during her fertility period, followed by his total denial that he had participated in the IVF procedure. That his sperm had been switched in the clinic and that the DNA test was somehow faulty. Harlow was served; he participated thru counsel all the way to the Thai Supreme Court, and later indicated that the Supreme Court in Thailand was correct.

Harlow attempted to disguise the true value of his investment accounts, securities, investment/brokerage accounts, mutual funds and secured or unsecured notes at 10% of their actual value as he "mentally considered the remaining 90% as his American wife's.

In a 4684 Supporting Statement, to his handwritten 2016 tax return, Harlow claimed a $140,000.00 loss through theft because he was the victim of a 3 continent scheme which, over 16 years, involved extortion, blackmail, trickery, identity theft, credit card theft , and

14

cash theft by Wipaporn, her husband and her Illinois law firm. He further claimed that
$1.236 million was <u>adjudicated</u> to be due with over $1 million more in expenses and losses
and costs incurred to defend fraudulent claims brought by Ladden & Allen (Wipaporn's
Illinois law firm) He went on to state that he has reported these crimes to the Chicago
police and the U.S. Department of State. All of these claims are false except for his making
false reports to the Chicago police and the State Department, which was apparently true as
Harlow also attached a copy of the false police report to the tax return.

WHEREFORE IT IS HEREBY ORDERED:

A. That Respondent shall pay to the Petitioner the sum of $11,000 per month as
and for the child support for <u>each</u> of the parties 3 children through the
child's minority. Age of majority is 20 years of age. Child support is
retroactive to April 1, 2013.

B. That 503(g) trusts shall be set up for each of the children, ███ ███
and ███ within 21 days of entry herein. Harlow shall deposit ONE
MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000.) into each of
the boys trust funds. The funds will be used for child support, actual private
medical and dental insurance payments as well as for extracurricular
activities. The trust corpus amounts are slightly less that the full amount
Harlow will be required to pay over the years, but, interest should accrue in
sufficient amount to cover the differences.

C. Michael Ian Bender and Winton Perry shall be co-trustees of said trusts. Mr.
Perry shall continue as co-trustee, so long as Winton is married and
cohabiting with Wipaporn and the 3 children. In the event that Winton Perry
is no longer eligible to act as trustee, Michael Bender shall select a co-trustee.

D. Counsel for Wipaporn shall tender a proposed 503(g) trust format to the
court within 21 days, for its approval.

E. The current 503 (g) trust shall remain in place until all fees and cost have been resolved. Any remaining funds shall be distributed equally into the three new trusts as part of the one million five hundred thousand ordered to fund the three trusts.

F. That in the unlikely event that the parties should agree that it is in the children's best interest to attend private school, then they will each be responsible for one half of all the cost, mandatory or otherwise to allow the children to attend said private school.

G. That the parties shall communicate through Our Family Wizard at all times, except in cases of emergency. Both shall sign up for that service within 7 days of entry of this order.

H. That the cost of the college education of the minor children of the parties pursuant to 750 ILCS 5/513 is reserved until further order of court, but, shall be paid pursuant to the financial ability of the parties, at the time the children are ready to enter college.

I. That the court retains jurisdiction for the purpose of enforcing the instant order.

Judge Jeanne Cleveland Bernstein

ENTER:        SEP 14 2018

Circuit Court - 1883

_____
JUDGE

16